UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                 Case Number 07-20243-BC
                                      Related Case Number 08-50303-BC
KENNETH E. YAROCH,             Honorable Thomas L. Ludington

        Defendant,

_____/

## OPINION AND ORDER ADDRESSING CERTAIN SENTENCING ISSUES, CONTINUING EVIDENTIARY HEARING ON ISSUES OF FACT, AND DIRECTING SUPPLEMENTAL BRIEFING

On December 21, 2007, Defendant Kenneth Yaroch entered a plea of *nolo contendere* to a single count of an 82-count information. This count charged him with a violation of 18 U.S.C. § 656 for the willful misapplication of moneys, funds, or credits by a bank officer, based on his work for his former employer, Signature Bank. On April 10, 2008, the Court entered an order directing the parties to provide supplemental briefing on a variety of factual and legal issues, in light of the Presentence Report (PSR) issued by the United States Probation Department (Probation), of February 19, 2008 and as amended on March 26, 2008, and Defendant's objections to the PSR of March 14, 2008.

Certain factual issues remain, such as those pertinent to the extent of relevant conduct under U.S.S.G. § 1B1.3, the amount of loss under U.S.S.G. § 2B1.1, and Defendant's status as an employee in a position of trust under U.S.S.G. § 3B1.3. These issues require the Court to continue Defendant's sentencing hearing to address these factual concerns and to ascertain whether the government can support them by the preponderance of the evidence. The Court reaches

determinations on other legal issues, however, including the following: (1) the factual basis for his

nolo contendere plea; (2) his acceptance of responsibility under U.S.S.G. § 3E1.1; (3) gross receipts

under U.S.S.G. § 2B1.1(b)(13); and (4) the scope of Defendant's restitution obligation.

## I.

On May 9, 2007, a grand jury issued an initial indictment against Defendant, charging him

with 18 counts of bank fraud, in violation of 18 U.S.C. § 1344.[1]  On June 13, 2007, the grand jury

issued a first superseding indictment against Defendant, charging him with 52 counts, including 51

counts of bank fraud, in violation of 18 U.S.C. § 1344, and one count of a false statement to a bank,

in violation of 18 U.S.C. § 1005.[2]  On July 11, 2007, the grand jury issued a second superseding

indictment against Defendant, charging him with 81 counts, including 78 counts of bank fraud, in

violation of 18 U.S.C. § 1344, and three counts of a false statement to a bank, in violation of 18

U.S.C. § 1005.  On December 21, 2007, the government issued a third superseding information,

charging Defendant with 82 counts, including 78 counts of bank fraud, in violation of 18 U.S.C. §

1344, three counts of a false statement to a bank, in violation of 18 U.S.C. § 1005, and a single count

---

[1]The elements of bank fraud under 18 U.S.C. § 1344 are as follows: (1) knowingly; (2) executes or attempt to execute a scheme or artifice; and (3) the scheme or artifice is to defraud a financial institution or to obtain any of the moneys or property of a financial institution by means of false or fraudulent pretenses.

[2]As pertinent here, the elements of making a false statement to a bank under 18 U.S.C. § 1005 are as follows: (1) a person who is an agent of a Federal Reserve bank; (2) makes a false entry in a book, report, or statement of the bank; (3) with the intent to injure, defraud, or deceive the bank. Alternatively, the elements include the following: (1) a person who is an agent of a Federal Reserve bank; (2) who lacks authority from the bank to do so; (3) makes, draws, issues, puts forth, or assigns any certificate of deposit, draft, order, bill of exchange, acceptance, note, debenture, bond, or other obligation, or mortgage, judgment or decree.

of misapplication of bank funds, in violation of 18 U.S.C. § 656.[3]

On that same day, Defendant entered into a plea agreement, pursuant to Federal Rule of Criminal Procedure 11. Of the 82 counts against him in the third superseding information, Defendant plead *nolo contendere* only as to count 82, a violation of 18 U.S.C. § 656.

The parties agreed that the Court will consider the sentencing range in light of the United States Sentencing Guidelines.[4] The government "recommends" at ¶ 2B of their Rule 11 Plea Agreement that the Court conclude that the appropriate sentencing guidelines range is 33 to 41 months, while Defendant suggests that the appropriate guidelines range is 8 to 14 months. The parties expressly preserve sentencing guidelines objections regarding the fraud loss amount, the consideration of relevant conduct (i.e., "use by the [C]ourt of conduct described in any of the dismissed counts," ¶ 2B(2)) and the application of a two-level enhancement for abuse of trust. The agreement further provides as follows:

> The Court is not bound by either party's recommendation concerning the guideline range, and [Defendant] understands that he will have no right to withdraw his guilty plea if the court does not follow his recommendation.

*Plea Agreement*, ¶ 2B. Regarding each party's right to withdraw from the agreement, it provides:

> The government may withdraw from this agreement if the Court finds the correct guideline range to be different than is determined by Paragraph 2B.

---

[3]As pertinent here, the elements of misapplication of bank funds under 18 U.S.C. § 656 are as follows: (1) a person who is an agent of a Federal Reserve bank; (2) willfully; (3) with an intent to defraud the bank; (4) misapplies any of the moneys, funds or credits of such bank. *See United States v. Woods*, 877 F.2d 477, 480 (6th Cir. 1989) (citations omitted).

[4]Although not expressly recognized in the plea agreement, the Sentencing Guidelines are now advisory, rather than mandatory. *See United States v. Booker*, 543 U.S. 220 (2005). While courts may elect to sentence a defendant outside the guidelines range, they must yet calculate the guidelines range and consider it as a relevant factor in determining a sentence. *See United States v. Stone*, 432 F.3d 651, 654-655 (6th Cir. 2005).

Defendant may withdraw from this agreement, and may withdraw his nolo contendere plea, if the Court decides to impose a sentence higher than the maximum allowed by Part 3. This is the only reason for which [D]efendant may withdraw from this agreement. The Court shall advise [D]efendant that if he does not withdraw his nolo contendere plea under this circumstance, the Court may impose a sentence greater than the maximum allowed by Part 3.

*Id*. at ¶ 6. Part 3 provides that Defendant's sentence of imprisonment may not exceed the maximum

of the guideline range as set forth in Paragraph 2B. As to the parties' appeal rights, the plea

agreement provides:

If the sentence imposed falls within the guideline range recommended by [D]efendant in Paragraph 2B, above, [D]efendant waives any right to appeal his conviction. Defendant retains his right to directly appeal the [C]ourt['s] adverse determination of any disputed guideline issue that was raised at or before the sentencing hearing. The government agrees not to appeal any sentence within the guideline range it has recommended in Paragraph 2B, but retains the right to appeal any determination by the Court to apply a lower range or to impose a sentence below the guideline range that is unreasonable. Each party retains its right to directly appeal this [C]ourt's order of restitution.

*Id*. at ¶ 7.

After he entered his nolo contendere plea, Defendant spoke with Probation. Defendant then

provided the following statement to Probation regarding the offense of conviction:

Customer (D.S.) was in the office requesting a draw for 4500 on her line of credit. I completed the draw ticket but the customer did not bring in the necessary information regarding what the purpose was for (to build a drain field) on bill. Apparently I was working with K.P.'s account and his account number on the deposit ticket. Apparently, the draw got mixed with other paperwork and got processed. This was carelessness on my part and amounts to miss application [*sic*] of bank's funds.

PSR, ¶ 99 (quoting Defendant's statement to Probation). Because two elements of an offense under

18 U.S.C. § 656 are that the offense be committed willfully and with an intent to defraud,

Defendant's most recent explanation of the events does not square with the elements of the offense.

That is, he seeks to excuse his conduct by stating that paperwork "got mixed" up between two

accounts. He also refers to "carelessness," which is inconsistent with willful or intentional conduct.

Regarding the parties' differences relating to guidelines scoring, the government and Defendant disagree on at least three points: (1) a 16-level increase for loss in excess of $1 million, per U.S.S.G. § 2B1.1(b)(1)(I); (2) a two-level increase for deriving more than $1 million in gross receipts from one or more financial institutions as a result of the offense, per U.S.S.G. § 2B1.1(b)(13)(A); and (3) a two-level increase for an abuse of a position of trust, per U.S.S.G. § 3B1.3. Defendant also disputes the meaning of "relevant conduct," under U.S.S.G. § 1B1.3. Additionally, Probation's analysis of these sentencing guidelines issues largely corresponds to the government's conclusions.

Underlying the different legal issues remains a significant factual dispute between Defendant and his former employer, the bank. Defendant presents himself as a loyal employee for 26 years who accepted the unusual responsibility for maintaining an enormous loan portfolio for the bank, largely as a result of the bank's approach to management. He acknowledges most of the events referred to in the third superseding information, but he seeks to explain each as happenstance events, resulting from the bank's purportedly unreasonable expectations for the volume and rate of his productivity. He contends that, in addition to the required rate of speed for issuing loans, his superiors at the bank reviewed most, if not all, of the loans he issued. Indeed, those same persons had no less responsibility than Defendant for quality assurance and compliance. Defendant views the bank's management as sharing, if not fully bearing, responsibility for the allegations regarding loans in the third superseding information, because of his demanding workload, deficiencies in loan review, and failure to ensure compliance with banking standards. The bank's perspective on his contentions remains unclear.

At the hearing on April 21, 2008, the parties came prepared to offer evidence and testimony. Following a brief overview of the issues addressed by the parties in their sentencing memoranda, the government offered testimony from Richard Carncross, the president and chief executive officer of Huron Corporation, the holding company that owns Signature Bank. The bank operates and serves customers in four counties in Michigan and is engaged in general commercial and retail banking. It also conducts lending activities in the residential and commercial mortgage markets, the general commercial market, the agricultural market, and the consumer installment market. Plante & Moran, P.L.L.C. served as the independent auditor for the bank for 2003 through 2006.

Carncross testified about the bank's oversight of its lending business. He explained that formal lending policies existed and that Defendant violated these rules. Carncross specifically referred to a consumer lending manual regarding the bank's less formal rules for determining the merits of any loan. That manual, he testified, included instructions for assessing a borrower's ability to repay a loan. Carncross also confirmed that Defendant was employed as one of the bank's 25 loan officers and had responsibility for about 34% of the bank's loan portfolio. He stated that Defendant was authorized to make secured loans up to $500,000 and unsecured loans up to $50,000.

In addition to the loan officers, Carncross explained that the bank had further layers of oversight. Defendant's supervisor, Daniel Cregeur, had initial oversight and he reviewed each of Defendant's loans. Also, a loan review committee, known as the "discount committee" and chaired by Carncross, met every Monday to review a summary of all relevant information about each new or renewed loan. This information included the borrower, the amount of the loan, the assigned loan number, the collateral accepted as security for the loan, and the relevant interest rate. According to Carncross, he believed that reports existed for every loan written or rewritten by Defendant and that

the discount committee reviewed each of the transactions at issue in the third superseding information, which allegedly violated the law.

Beyond the review of the discount committee, internal examiners and accountants at Plante & Moran also examined loans for basic compliance. Carncross stated that those reviews occurred through a sampling of loans, which comprised about 10% of the bank's loans. He testified that neither the discount committee, his immediate supervisors, or Plante & Moran identified the loan problems now attributed to Defendant.

Carncross also described how the bank, together with Plante & Moran's oversight, established its reserve for loan losses. As loan losses are estimated to have occurred, the bank establishes its allowance for loan losses. Once a loan's status is confirmed as uncollectible, the bank will charge those loan losses against its loan loss reserve. Any later recoveries result in a credit to the loan loss allowance. The chart below shows, in thousands of dollars, the bank's provisions for loan reserves and loans that it charged off from 2003 through 2006:

| Year | Provision for Loan Losses | Loans Charged Off |
|------|---------------------------|-------------------|
| 2003 | $272,000 | $234,000 |
| 2004 | $396,000 | $334,000 |
| 2005 | $3,062,000 | $2,173,000 |
| 2006 | $1,284,000 | $1,853,000 |

Gov't Exs. 105, 106. The bank had not yet identified Defendant's alleged misconduct in 2004, but the subsequent year its provisions for loan losses and loans charged off increased substantially.

The government also provided the Court with a report from the Federal Deposit Insurance Corporation (FDIC). In that report, the FDIC recommended that Defendant be removed from his

role as a loan officer at a bank and barred from serving in such a role in the future.  The FDIC

reached this recommendation based on its interpretation of 12 U.S.C. § 1818(e)(1), which the FDIC

described as having the following elements:

> The agency must find that [Defendant] has done one of the following:
> (a) committed a violation of law, regulation, or final cease-and-desist order,
> (b) engaged or participated in an unsafe or unsound banking practice, or
> (c) committed or engaged in any act, omission or practice which constitutes a breach of such party's fiduciary duty.
> The agency must determine that by reason of such violation, unsafe or unsound practice or breach of fiduciary duty:
> (a) the bank has suffered or will probably suffer financial loss or other damage.
> (b) the interests of the bank's depositors have been or could be prejudiced.
> (c) [Defendant] has received financial gain or other benefit.
> The agency must determine that such violation or unsafe or unsound practice or breach of fiduciary duty is one involving personal dishonesty or one which demonstrates a willful or continuing disregard for the safety or soundness of the bank.

*FDIC Report of May 30, 2006*, Gov't Supp'l Br., Ex. B, pp. 13-14 [dkt #34-3].

By applying these factors to the same set of facts on which the government issued many

criminal charges, the FDIC recommended taking action against Defendant.  In particular, as to the

first and second factor, the FDIC relied on the following details to conclude that Defendant had

engaged in unsafe and unsound practices and that the bank suffered because of those practices.  The

FDIC stated, regarding the first of these factors, as follows:

> [Defendant's] actions described in this document clearly constitute unsafe and unsound practices and breached his fiduciary duty by purposefully:
> • Making unauthorized draws on customers' lines of credit and depositing such funds in another customer's account.
> • Extending loans in one customer's name without that customer's consent or knowledge, and giving the loan proceeds to another customer.
> • Extending a loan to a customer and depositing the loan proceeds into another customer's account without the consent or knowledge of the borrower.
> • Forging signatures on loan documents and loan disbursement checks.
> • Misrepresenting loan purpose and fabricating collateral in loan documents.

In addition, misrepresenting security agreements and UCC Financing filings.

- Routinely extending credit in nonconformance with bank policy, which involved capitalization of interest.
- Engaging in objectionable and undesirable lending practices.
- Concealing loan delinquencies by continually making new loans to pay off old loans, with little or nor principal reduction.
- Acting in direct opposition to Board directives which he signed in acknowledgment of understanding.
- Extending loans made with no cash flow analysis, no basis of repayment and no collateral.

*Id*. at p. 14.

The FDIC stated, regarding the second of these factors, as follows:

**Financial loss to the bank** - In 2005 and the first quarter of 2006, as a result of [Defendant's] hazardous lending actions, the bank reviewed his portfolio and charged off 166 loans deemed uncollectible, for a total of $2,507,955 of principal and $117,131 of accrued interest and accrued late fees. A significant amount of the rest of [Defendant's] portfolio has identified weaknesses and the bank will suffer additional losses. As of March 31, 20056, the bank has identified and classified an additional $3,003,569 (61 loans) of [Defendant's] loans as Substandard, and $1,988,245 (50 loans) as Doubtful . . . .

*Id*.

Carncross testified that the FDIC commenced its review based on a Suspicious Activities Report furnished to the FDIC after Defendant left his employment at the bank. Carncross further testified that the bank was not for sale and that no effort was underway to market it for sale.

Carncross did testify that the bank sought compensation from Defendant, through a lawsuit filed in state court, for the misconduct described in the third superseding information. In addition, Carncross explained that the bank also sought, in the same lawsuit, to attribute to and recover from Defendant the loss associated with the transfer of approximately $11,932,202 of the bank's loans to a competitor bank, Defendant's subsequent employer, as well as $458,039 in "lost" deposits. The bank and Defendant settled that case for a release of all claims and for $35,000.

Beyond that, Carncross acknowledged that the bank had submitted a fidelity claim to its blanket bond insurer. He could not recall when the bank made the claim, but he did recall the insurer's unwillingess to pay it because the loss did not include any self-dealing. He believed that the bank intended to pursue the matter further with the insurer. He acknowledged that the claim, its supporting documentation, the bond for the insurance, and the insurer's response could be made available for the Court to review, but that, despite an order, it had not been brought to Court.

Finally, Carncross briefly examined Exhibit A to the government's sentencing memorandum, which summarizes loans from the bank in the amount of $695,737.83, on which the government now seeks restitution. Carncross, however, was not responsible for summarizing that information and, so, was unable to explain its compilation.

## II.

Despite the level of minutia of detail required, resolution of Defendant's sentence necessitates a particularized understanding of the events outlined in the third superseding information. Drawn from the PSR, what follows below is a chart listing the bank loan that provided the predicate for each of the counts against Defendant. The chart also provides the date of each loan, the amount for each loan, the type of loan, and the applicant for the loan.

| Ct | Date | Amount | Type of Loan | Applicant |
|---|---|---|---|---|
| 1 | 5/5/05 | $6,000.00 | Line of Credit | S.S.[5] |
| 2 | 5/31/05 | $3,200.00 | Line of Credit | S.S. |
| 3 | 7/29/05 | $4,500.00 | Line of Credit | D.S./C.S. (see also count 82) |

[5]In the chart and descriptions of transactions that follow, the borrowers are identified only by their initials so as to preserve some measure of privacy for these particular financial dealings. Also, where possible, the Court has endeavored to eliminate specific reference to other individuals who had no loan from the bank that is the subject of the charges against Defendant.

| | | | | |
|---|---|---|---|---|
| Counts 1-3 Total | | **$9,200.00** | | |
| 4 | 3/21/02 | $19,219.51 | Business Loan | C.D. |
| 5 | 1/24/03 | $15,699.34 | Business Loan | C.D. |
| 6 | 3/7/03 | $18,607.12 | Business Loan | C.D. |
| 7 | 12/19/03 | $16,490.42 | Business Loan | C.D. |
| 8 | 3/19/04 | $18,524.77 | Business Loan | C.D. |
| 9 | 12/17/04 | $16,863.30 | Business Loan | C.D. |
| 10 | 4/29/05 | $24,510.39 | Business Loan | C.D. |
| Counts 4-10 Total | | **$129,914.85** | | |
| 11 | 2/13/04 | $45,000.00 | Business Loan | M.P./C.P. |
| 12 | 3/24/05 | $45,000.00 | Business Loan | M.P./C.P. |
| 13 | 5/20/05 | $32,485.00 | Business Loan | M.P./C.P. |
| 14 | 9/16/05 | $19,565.48 | Business Loan | C.P. |
| Counts 11-14 Total | | **$142,050.48** | | |
| 15 | 4/11/03 | $56,310.44 | Business Loan | W.H. |
| 16 | 1/7/05 | $20,000.00 | Business Loan | W.H. |
| 17 | 6/29/05 | $26,080.50 | Business Loan | W.H. |
| 18 | 8/22/05 | $2,585.00 | Business Loan | W.H. |
| Counts 15-18 Total | | **$104,975.94** | | |
| 19 | 4/26/01 | $1,550.00 | Consumer Loan | L.G. |
| 20 | 7/3/01 | $1,050.00 | Consumer Loan | L.G. |
| 21 | 8/30/01 | $3,250.00 | Consumer Loan | L.G. |
| 22 | 11/2/01 | $755.00 | Consumer Loan | L.G. |
| 23 | 1/30/02 | $10,110.00 | Consumer Loan | L.G. |
| 24 | 7/3/02 | $10,110.59 | Consumer Loan | L.G. |
| 25 | 11/27/02 | $4,689.53 | Consumer Loan | L.G. |

| 26 | 12/6/02 | $10,486.33 | Consumer Loan | L.G. |
|---|---|---|---|---|
| 27 | 1/23/03 | $875.00 | Consumer Loan | L.G. |
| 28 | 6/18/03 | $10,687.10 | Business Loan | L.G. |
| 29 | 10/6/03 | $6,287.30 | Business Loan | L.G. |
| 30 | 11/14/03 | $875.00 | Business Loan | L.G. |
| 31 | 11/25/03 | $575.00 | Consumer Loan | L.G. |
| 32 | 2/9/04 | $10,671.87 | Consumer Loan | L.G. |
| 33 | 3/22/04 | $575.00 | Consumer Loan | L.G. |
| 34 | 9/8/04 | $1,316.82 | Consumer Loan | L.G. |
| 35 | 11/8/04 | $2,138.53 | Consumer Loan | L.G. |
| 36 | 3/21/05 | $2,704.34 | Consumer Loan | L.G. |
| 37 | 7/6/05 | $8,994.66 | Business Loan | L.G. |
| Counts 19-37 Total | | **$87,702.07** | | |
| 38 | 2/27/03 | $2,450.00 | Business Loan | R.H. |
| 39 | 4/28/03 | $10,075.00 | Business Loan | R.H. |
| 40 | 12/14/04 | $54,535.94 | Business Loan | R.H. |
| Counts 38-40 Total | | **$67,060.94** | | |
| 41 | 1/1/05 -8/5/05 | $8,000.00 | False statements on Mortgage Loan or Consumer Loan | F.K. |
| Count 41 Total | | **$8,000.00** | | |
| 42 | 2/26/04 | $56,900.00 | Mortgage Loan | M.J./C.J. |
| 43 | 2/25/05 | $25,000.00 | Business Line of Credit | M.J./C.J. |
| Counts 42-43 Total | | **$81,900.00** | | |
| 44 | 12/18/02 | $28,789.92 | Business Loan | J.H./S.H. |
| 45 | 5/27/03 | $52,404.91 | Business Loan | J.H./S.H. |

| 46 | 7/14/04 | $56,647.37 | Business Loan | J.H./S.H. |
|---|---|---|---|---|
| 47 | 6/29/05 | $25,085.00 | Business Loan | J.H./S.H. |
| 48 | 9/14/05 | $51,893.57 | Business Loan | J.H./S.H. |
| Counts 44-48 Total | | **$214,820.77** | | |
| 49 | 11/15/04 | $15,075.00 | Business Loan | K.H. |
| 50 | 12/27/04 | $7,075.00 | Business Loan | K.H. |
| 51 | 4/29/05 | $11,085.00 | Consumer Loan | K.H. |
| 52 | 8/26/05 | $11,085.00 | Consumer Loan | K.H. |
| Counts 49-52 Total | | **$44,320.00** | | |
| 53 | 10/15/02 | $77,235.52 | Business Loan | K.P./S.P. |
| 54 | 4/21/03 | $59,977.90 | Business Renewal Loan | K.P./S.P. |
| 55 | 10/31/03 | $59,977.90 | Business Renewal Loan | K.P./S.P. |
| 56 | 6/30/04 | $59,977.90 | Business Renewal Loan | K.P./S.P. |
| 57 | 11/4/02 | $6,065.00 | Business Loan | K.P./S.P. |
| 58 | 2/3/03 | $6,065.00 | Business Renewal Loan | K.P./S.P. |
| 59 | 5/27/03 | $6,065.00 | Business Renewal Loan | K.P./S.P. |
| 60 | 4/21/03 | $40,075.00 | Business Loan | K.P./S.P. |
| 61 | 6/9/03 | $10,075.00 | Business Loan | K.P./S.P. |
| 62 | 10/31/03 | $105,651.72 | Business Loan | K.P./S.P. |
| 63 | 6/30/04 | $103,023.68 | Business Renewal Loan | K.P./S.P. |
| 64 | 1/19/04 | $15,075.00 | Business Loan | K.P. |
| 65 | 2/25/04 | $15,075.00 | Business Loan | K.P. |
| 66 | 6/30/04 | $8,075.00 | Business Loan | K.P. |

| 67 | 6/19/04 | $18,075.00 | Business Loan | K.P. |
|----|---------|------------|---------------|------|
| 68 | 8/31/04 | $60,075.00 | Business Loan | K.P. |
| 69 | 9/30/04 | $15,075.00 | Business Loan | K.P. |
| 70 | 10/25/04 | $110,075.00 | Business Loan | K.P. |
| 71 | 10/25/04 | $100,075.00 | Business Loan | K.P. |
| 72 | 12/24/04 | $12,075.00 | Business Loan | K.P. |
| 73 | 2/28/05 | $20,085.00 | Business Loan | K.P. |
| 74 | 2/8/04 | $20,000.00 | False Statements for Business, Personal, and Mortgage Loans and Lines of Credit | K.P./S.P. |
| 75 | 2/28/05 | $0.00 | False Statements for Business, Personal, and Mortgage Loans and Lines of Credit | K.P. |
| Counts 53-75 Total | | **$927,949.62** | | |
| 76 | 10/7/05 | $19,165.00 | Business Loan | D.S. |
| 77 | 11/16/05 | $16,650.00 | Business Loan | D.S. |
| 78 | 9/8/06 | $5,800.00 | Business Loan | D.S. |
| 79 | 11/16/06 | $36,818.00 | Business Loan | D.S. |
| 80 | 2/28/07 | $8,572.26 | Business Loan | D.S. |
| Counts 76-80 Total | | **$87,005.26** | | |
| 81 | 12/30/05 | $22,165.00 | Business Loan | C.J. |
| Count 81 Total | | **$22,165.00** | | |
| 82 | 7/29/05 | $4,500.00 | Withdrawal from Line of Credit Owned by Another | K.P. |

| Count 82 Total | **$4,500.00** | |
|---|---|---|
| TOTAL | **$1,931,564.93** | |

Also drawn from the PSR, are the following more detailed descriptions of the factual circumstances pertinent to each of the loans summarized above. Also included and interspersed within those more detailed descriptions are statements that Defendant seeks to have the Court consider as to those particular counts, subject to his continuing objection regarding relevant conduct under U.S.S.G. § 1B1.3. The factual descriptions of each count, from the PSR, coupled with Defendant's competing representations, appear below:

<u>Counts 1-2: S.S.'s Line Drawn Down but Deposited to K.P.'s Account</u>

Counts 1 and 2 allege that on May 5, 2005, and May 31, 2005, [Defendant] approved and executed a draw of $6,000 and $3,200 respectively on the account of [the bank] customer S.S.'s commercial line of credit. In both instances, the funds were immediately deposited into K.P.'s account at [the bank].

This draw was done without the knowledge or approval of S.S. According to investigators, S.S. had no personal knowledge of who K.P. was. The Suspicious Activity Report prepared by [the bank] in relation to these transactions note, "The account numbers are too unique to accept it as a mistake." (PSR ¶¶ 27-28.)

<u>Defendant's Position as to Counts 1-2</u>:

Paragraph [27] should have the following added to it:

There were mistakes made by the jumbo of paperwork on those particular days and they should have been caught by bookkeeping. They were subsequently discovered at some point in time and reversed as to S.S. with the obligation falling entirely on K.P. [Defendant] had the authority to overdraw K.P.'s line of credit and these are merely mistakes as there is no way he would want to involve S.S. with K.P. and it would be completely unnecessary to do so. When confronted with this by . . . Carncross and . . . Cregeur at a meeting called by them in January of 2006, these items were brought to [Defendant's] attention and he offered to go see K.P. in an attempt to resolve the matter, but they told him not to do so.

Paragraph [28] should state the date of the suspicious activity report, which had to be after [Defendant] left the [b]ank. The Paragraph should continue by saying

-15-

[Defendant] had the authority to overdraw K.P.'s line of credit and had no reason to involve a third party with K.P.'s account.

Count 3: D.S. Line Drawn Down but Deposited to K.P. Account

Count 3 alleges that on July 29, 2005, [Defendant] using the same procedures as above, executed a draw of $4,500 on the commercial line of credit account of D.S. and C.S. and then immediately deposited the funds into K.P.'s account at [the bank]. This draw was accomplished without the knowledge or approval of either D.S. or C.S. (PSR ¶ 29.)

Defendant's Position as to Count 3:

Again, [Defendant] had the authority to overdraw K.P.'s account and had no reason to involve a third party and he believes this matter should have been caught by bookkeeping and should never have occurred. . . . Cregeur, [Defendant]'s immediate supervisor wrote a letter to D.S. and C.S. apologizing for the mistake and reversed the transaction out of their account. . . .

Counts 4-10: Misrepresented C.D. Loans

Counts 4 through 10 involved [Defendant] processing and approving business loans to C.D. in amounts totaling $129,914.85.

In each of the instances, [Defendant] would complete a loan application which C.D. would sign. According to the application, C.D. was involved in the construction trade. The purpose of the loan was to finance the purchase of equipment. The security made available to the bank for the loan was the equipment he purchased with the loan proceeds.

Investigators later learned that C.D. was not involved in or about to become involved in any business at the time he submitted the loan application. In addition, he was not purchasing nor did he own any equipment.

C.D. was interviewed by investigators in October of 2006. He began the interview by commenting that [Defendant] should never have given him loans. C.D. indicated he never had a construction business as stated on the loan documents. C.D. lived in a home without central heating or telephone service. He used the loan proceeds to do some remodeling on the home and to purchase a used automobile. When this automobile was no longer driveable, [Defendant] loaned him additional monies so another car could be purchased.

While [Defendant] was extending C.D. more loans, C.D. was being kept at the same payment schedule. Typically, he paid only interest payments and did not make any

payments on the principal. According to C.D., [Defendant] would then give him a new loan but the check would go to pay his old loans. He was emphatic that he never told [Defendant] the money was to be used to start a construction business. C.D. always told the defendant the purpose of the loan was to remodel his house or to buy a car.

At the time these loans were issued, C.D. was employed earning approximately $10.75 per hour. He indicated he signed loan applications without reading them, not realizing that [Defendant] had noted the loans were for equipment for a construction business. (PSR ¶¶ 30-35.)

Defendant's Position as to Counts 4-10:

In view of the fact that loans total $41,373.69 and not $129,914.85, the Probation Officer should review Paragraphs 30 – 35 in their entirety. The fact of the matter is C.D.'s loan originated in 1999 and this was a workout arrangement well known by [the bank] and [Defendant] accepted the information provided him by C.D. and the same on applications, which were approved by C.D. In fact, C.D. was believed to be a capable person in the construction business and, in fact, as stated, was and did remodel his home. [Defendant] was instructed as a bank that if a loan commenced as a cattle loan it stayed as a cattle loan. If it commenced as a construction loan it stayed as a construction loan. This is extended in many of the loans involved in Counts 1 – 75.

Counts 11-14: Misrepresented M.P. and C.P. Loans

Counts 11, 12, and 13 involved [Defendant] approving a business line of credit to M.P. and C.P. in an amount totaling $112,485.

The procedure followed by [Defendant] in these counts were the same as those described earlier. [Defendant] would complete the loan application forms and then have M.P. and C.P. sign them. The application for this business line of credit indicated the type of business they were involved in was farming and the purpose of the loan was the production of cattle. The source of repayment of the loan would be the sale of cattle, and the security for the loan would be cattle and machinery. A note appeared in the paperwork stating, "Purchase cattle and feed–C.P. M.P. is truck driver and makes $40,000 year." In actuality, at the time these loans were processed, M.P. and C.P. did not have a farm and did not have any cattle or equipment. The loan was for the purpose of making home repairs and opening an adult foster care home. The home was to be run by the parents of C.P. D.S., one of the individuals involved in Count 3 of this Indictment, is C.P.'s mother.

C.P. advised she was not aware that the loan documentation indicated she owned cattle, as she trusted [Defendant] to complete the paperwork with the correct

information. She states she previously had received loans from [the bank] that [Defendant] had prepared, without having read the documents.

Count 14 was a business loan granted to C.P. in her name alone. The listed purpose of the loan was for feed and calves. This application did not refer to the type of business in which C.P. was involved or the security that would be made available for the loan. However, the note stated the loan was secured by a security agreement dated November 20, 2003. That security agreement stated that M.P. and C.P.'s type of business was farming and that "all cattle now owed and hereafter acquired" would serve as collateral for the debts owned by [the bank]. As in the prior counts, M.P. and C.P. were not involved with any type of farming/cattle operation and the purpose of the loan was to make home repairs and open an adult foster care home. (PSR ¶¶ 36-39.)

Defendant's Position as to Counts 11-14:

As noted, the correct number in Paragraph 36 is $97,050.48. The [b]ank, because of its real purpose in going after [Defendant] is being very disingenuous in the information provided. D.S. and C.S. who were C.P.'s parents had filed bankruptcy as dairy farmers and this entire loan situation is a workout which actually resulted in the acquisition of an adult foster care home being run by M.P. and C.P. and D.S. and C.S. with [the bank] being paid out in full less some discount that they and they alone decided to give. [Defendant's] supervisors and the loan committees knew exactly what was going on and approved of it and, in fact, M.P. and C.P. indicated they were buying calves or feeders to be fed out in addition to the home and also on that property and did so as far as [Defendant] knows. D.S. and C.S. have been dairy farmers and C.P. having been raised on a dairy farm, these paragraphs should be recited to reflect the true facts and the Probation Department should cease sounding like the [p]rosecutor himself.

Counts 15-18:  Misrepresented W.H. Loan

Counts 15 through 18 involved the issuance of business loans to W.H. The total amount of the loans was for $104,975.94. The stated purpose of the first loan was "equipment--building inspect deck--debit consolidation" for a farm business. The application was filled out by the defendant and signed by W.H. During interviews, W.H. indicated he did not review the document before signing it. The actual purpose of the loan was for the consolidation of previous debt. No equipment was purchased for any farming business with the loan proceeds. W.H. did not own and was not involved in running his own farm. In fact, he worked at another farm operation. He occasionally would complete drywall work. W.H. states he correctly and accurately informed [Defendant] of what his, W.H.'s, personal circumstances were and what the actual purpose of the loan was.

The rest of the loans to W.H., were executed under basically the same circumstances. The stated purpose for the loan in Count 17 was W.H.'s cattle business. However, the actual purpose of the loan was to pay off previous loans. No equipment or feed was purchased from these loan proceeds. (PSR ¶¶ 40-41.)

Defendant's Position as to Counts 15-18:

Again, there is a failure to understand the W.H. account. W.H. and his first wife had been customers of the [b]ank for probably 15 years and they were never past due. Then W.H.'s first wife divorced him and ultimately he filed bankruptcy, however, he provided a renewal to [the bank] and he made payments. Subsequently, he married [a woman who is] the daughter of a local, large Dutch dairy farm ([that] dairy farm just received a major award . . . ). W.H. worked on the dairy farm and he and his wife were to buy heifers and feeder cattle and raise them up and also were doing some fix up. The stated loans were for the purposes as stated and the loans were current when [Defendant] left the [b]ank. This additional information should be included in Paragraphs 40 and 41 so as to present a true picture.

Counts 19-37: Misrepresented L.G. Loan

Counts 19 through 37 involved consumer and business loans for L.G. The total amount of these loans was $87,702.07. These loans were executed by [Defendant] without the participation or knowledge of L.G. L.G. did not actually sign the loan application, the bank note, nor was he the recipient of the loan proceeds. The actual borrower in this transaction was L.G.'s father . . . . [L.G.'s father] was retired at the time these loan applications were processed.

[L.G.'s father] had borrowed money from [the bank] and had encountered difficulty in keeping up with the required payment schedule. He believed that it might be necessary for him to file bankruptcy. During the course of this investigation, [L.G.'s father] told investigators that he had spoken to [Defendant] and advised him that it would be necessary for him to file for bankruptcy protection. According to [L.G.'s father], [Defendant] suggested an alternative to filing for bankruptcy. He suggested that L.G. find someone else's name to put a loan into so that [L.G.'s father] could receive the proceeds. The name that was used was L.G., [L.G.'s father's] son.

L.G. was interviewed. He advised that he did not sign any loans nor receive any proceeds from them. It was his understanding that his father may have signed a loan and received proceeds thereof. L.G. did not have any prior knowledge of the loan being taken out in his name. L.G.'s only relationship with [the bank] had been in the 1990s when he had taken out a student loan. This loan had been paid off sometime ago. L.G. did not have an account at [the bank], nor was he a customer there at the time these transactions took place.

[L.G.'s father] advised authorities that he suffers from depression and stated that he has Alzheimer's Disease. He admitted signing his son's name to most of the documents. He also advised that [Defendant] was the only individual at the bank that he dealt with in connection with his loans.

In the next several years, [L.G.'s father] refinanced a number of existing loans and obtained some new loans as well through [Defendant] always putting the loans in his son's name.

Counts 28, 29, 30, and 37 involved business loans in L.G.'s name. The stated purpose of the loans was investment in a restaurant. As in the consumer loans, L.G. was not aware of what was happening and received no benefits. The actual loan documents were signed by [L.G.'s father].

During the investigation, [L.G.'s father] told investigators that he had not told [Defendant] that the loans were for a restaurant business and that [L.G.'s father] had not seen the notation about a restaurant business on the loan application. [L.G.'s father] further indicated that he often signed documents that [Defendant] had prepared without reading them. (PSR ¶¶ 42-48.)

Defendant's Position as to Counts 19-37:

First of all, the total loans were $22,370.87 not $87,702.00 as indicated. When [L.G.'s father] had some difficulty with his loans he was told there would be no further loans and [L.G.'s father] contacted his son, L.G., to assist him. L.G. spoke with [Defendant] and agreed to assist his [f]ather and L.G. signed the original two loans and everything was approved by . . . Cregeur. Unbeknownst to [Defendant], [L.G.'s father] may have signed his son's name beyond the original two notes. Subsequently, in order to get a better rate, L.G.'s brother, . . . had a restaurant and the stated purpose of business loans were to invest in that restaurant owned by [L.G.'s] brother . . . . In fact, contrary to what was said in Paragraph 44, L.G. talked with [Defendant] and gave him information used in the loan applications.

Again, the Probation Officer, by substantially enhancing the actual balance of any loans by more than $65,000.00, there is an attempt here to create a tempest in a teapot which did not exist. Only three loans existed and were current at the time [Defendant] left the [b]ank and unless [the bank] made some deal which they should not have the loans would be paid by [L.G.'s father] with the support of L.G. and possibly [his brother].

Counts 38-40: Misrepresented R.H. Loans

Counts 38, 39, and 40 involved three business loans to R.H., for a total of $67,060.94. Count 38 involved [Defendant] filling out a loan application, processing,

and approving a business purpose loan for R.H. [Defendant] wrote in the loan application that R.H. was involved in farming and the stated purpose of the loan was to finance the purchase of cows. The source of funds to use as repayment of the loan would be profits and the security for the bank would be the cattle themselves.

During this time frame, R.H. worked on his father's dairy farm but did not personally own any cattle. R.H. told investigators that he was not aware the loan application stated that the loan was for cattle. The loan actually was used for the purchase of a pickup truck.

R.H. quit working at the farm in February 2004. While working at the farm, he earned less than $700 every two weeks and grossed no more than $10,000 for the year. He did not own any of the farm's equipment or cattle. After February of 2004, R.H. obtained employment . . . earning $32,000 annually. R.H. advised investigators that [Defendant] knew he had left the farm and was working for [his employer] when he applied for the subsequent loans.

In regard to Counts 39 and 40, [Defendant] personally processed and approved these loans. For these two loans, R.H. did not have knowledge of or authorize the loan. The signature on the loan application is the signature of his father . . . . [R.H.'s father] told investigators that he signed the loan documents at [the bank].

The stated type of business activity R.H. was purportedly involved in at the time of the loan application was farming. [Defendant] wrote that the source of funds to be used for repayment of the loan would be "$1,000 per month." A note at the bottom of the application states, "Farms with dad--has own cows. 30 cows. He gets prorated income from dairy operations." Also included in the loan file was a personal financial statement indicating that R.H. owned $45,000 worth of cattle and the security made available to [the bank] for the loan would be cattle and machinery. The loan file also contained an unlimited continuity agreement dated December 14, 2004. A personal financial statement of R.H.'s in the loan file states that R.H. had $1,000 worth of feed, a $7,000 pickup truck, the aforementioned $45,000 in cattle, and $2,000 in equipment. (PSR ¶¶ 49–53.)

Defendant's Position as to counts 38-40:

The information stated on any of the applications were supplied by R.H. and he signed same. The first two loans which were believed to have been in the $2,000 range and the $45,000 range were signed in front of [Defendant] by R.H. He believed the information provided by R.H. was correct. The third loan consolidated everything into one was taken out of the [b]ank by [R.H.'s father] to have his son sign and was returned to the [b]ank by [R.H.'s father] and as [Defendant] recalls he had [R.H.'s father] guarantee the note of his son, R.H. The consolidated loan was current when [Defendant] left the [b]ank. As previously noted, the balance stated in

Paragraph 49 is incorrect. The only note is the one stated in Count 40. [The bank], in its wisdom, has settled its accounts with [R.H.'s father] and by doing so has let him off as a guarantor of R.H. What has happened with R.H. is not within the knowledge of [Defendant].

Count 41: F.K. Credit Facts

Count 41 alleges violation of false entries to make records or reports by bank officer. On or about August 5, 2005, [Defendant] personally executed and approved an $8,000 consumer loan to F.K. The stated purpose of the loan application was to build a garage onto a house. The loan file for F.K. included two 1040 income tax statements, both for F.K. and both for 2004. One of the returns showed income of $18,738. The other showed income of $8,738. Also included in the loan file was a personal financial statement from F.K. showing $27,000 in assets, $15,000 of which was personal property, and the balance was automobiles in his possession.

F.K.'s actual income in 2004 was $8,738. He did not submit to the IRS, to [Defendant], or to anyone else, a tax return for that year showing $18,738 in income. Additionally, F.K. was unable to identify what comprised the $15,000 of personal property listed on the financial statement. He further stated that although he could not recall submitting personal financial statements to [Defendant] for the loans, the handwriting on the financial statements appeared to be F.K.'s. Examination of the false $18,738 tax return disclosed that someone had simply placed a "1" in front of the $8,738 and placed the return in the file. (PSR ¶¶ 54-55.)

Defendant's position as to count 41:

It is [Defendant's] recollection that the loan to F.K. was in 2003 and it is unlikely that the 1-1-05 date is correct because that is New Year's Day. In any event, the information on any application was supplied by F.K. and the loan was made before he filed any income tax for 2004 which would not have been due until at least April 15, 2005. [Defendant] did not make any changes on any tax returns for anyone and, in particular, F.K., and if there are two tax statements in the file for the same time period and are contradictory they were not changed in any manner by [Defendant] and he has no knowledge of who, if anyone, may have changed any such documents. As indicated, the loan was made long before any tax return for 2004 was made or was due. This information should be reflected in paragraph 54 and 55.

Counts 42-43: The M.J. and C.J. Loan

Count 42 involved a mortgage loan in the amount of $56,900 to M.J. and C.J. Count 43 involves a business line of credit in the amount of $25,000 to M.J. and C.J.

A mortgage loan application completed by [Defendant] but signed by M.J. and C.J.

stated [they] owned $15,000 worth of cattle. The application also noted $2,400 of gross monthly income for M.J. and $1,200 of monthly income for C.J.

In actuality, M.J. and C.J. did not own any cattle or have a farming operation. They were not aware the loan application stated they had owned cattle. M.J. told investigators that [Defendant] had been to their home and should have been aware of the fact that they did not have a farming operation.

The stated purposes for the loan outlined in Count 43 was for repairs for a foster care home and cattle for a farm business. The application stated the source of funds to be used for repayment of the loan would be profits and the security being made available to the bank was land on the real estate mortgage. A note on the application states, "[M.J.] works as carpenter--runs cattle on side."

As indicated earlier, M.J. and C.J. had never been involved in their own farming operation, had not purchased any cattle, and were not in the process of or interested in doing so. They did not own "working capital" for a farming operation. (PSR ¶¶ 56-60.)

Defendant's Position as to Counts 42-43:

Here again the [b]ank has been very disingenuous. C.J. is a daughter of D.S. and C.S. previously mentioned who were involved in dairy farming and filed bankruptcy. Their daughter, C.J., was involved in a $23,000 note with her parents involving cattle and M.J. and C.J. were involved with M.P. and C.P. in assisting D.S. and C.S. in obtaining a foster care home and along with M.P. and C.P. were to raise cattle on the side. Again this is a work out scenario and, in fact, all of Counts 42 and 43 loans have been paid off in full. [Defendant] would further note that he has never been to the home of M.J. and C.J. This information should be reflected in Paragraphs 56 – 60 so as to present a true and proper picture.

Counts 44-48: The J.H and S.H. Loans

Counts 44 through 48 involve business loans issued in the names of J.H. and S.H. The total amount of these five loans was $214,820.77.

The procedure for J.H. and S.H. obtaining these loans were the same as indicated above. [Defendant] personally completed the loan application. J.H. and S.H. signed the application without reading it. The stated business activity J.H. and S.H. were purportedly involved in at the time was farming. The source of funds to be used for repayment of the loan was said to be "put back on payment in May." The security available to the bank for the loan was cattle. J.H. and S.H. were not involved in any farming business, becoming involved in one, or planning to become involved in one at the time they submitted the loan applications.

The stated purpose for Count 45 was for debt consolidation; Count 46 was listed as financing cattle; Count 47 stated the purpose of the loan was to finance the purchase of a vehicle and equipment; and the purpose of the loan indicated in Count 48 was for the renewal of a previous loan.

In actuality, J.H. and S.H. were not involved in any type of farming business, did not own any cattle, and were not in the process of purchasing any cattle. S.H. told investigators that she had a calf operation in 1998 or 1999, but lost all of her cattle to disease. She did not believe that [Defendant] was aware that she previously had this operation and she did not recall securing any loan for this purpose in either 1998 or 1999. She also did not recall discussing the 1998/1999 operation with [Defendant]. S.H. worked at a nursing home and her husband was disabled and unemployed. According to her, the defendant knew about their employment status as they had discussed it with him. The loans J.H. and S.H. were applying for were for personal expenses, not business purposes. J.H. and S.H. informed [Defendant] of the true purpose of the loans. (PSR ¶¶ 61-64.)

Defendant's Position as to Counts 44-48:

Again, in these Paragraphs the loans originated back in the 90s for cattle and dairy operation purposes. They got out, but were always going to raise cattle so, as per training at the [b]ank, these loans were kept as farming loans. As previously stated, the amount in Paragraph 61 is three times the actual amount of any loans, as Counts 44, 45 and 46 represent sums that are all combined through Counts 47 and 48. The balances were consolidations of farm and personal loans and were all current when [Defendant] left the [b]ank with general UCC filing on all assets. Again, the history of these folks will indicate that S.H., like C.J. and C.P., is a daughter of D.S. and C.S. and all these activities are a workout for [their] children. Since [Defendant] left [the bank] he is advised that [the bank] repossessed liened personal property resulting in a reduction in the amount of the loan balances. These true facts about S.H. should be reflected in the Probation Officer's report so that the report does not appear to be written by [the prosecutor] rather than a fair-minded Probation Officer.

Counts 49-75: The K.H. Loans

Counts 49 and 50 involve business loans to K.H. Counts 51 and 52 involve consumer loans to the same individual. The total of these loans was $44,320 At the time these loan applications were made, K.H. was a waitress. She was involved in a relationship with K.P. The type of business activity of K.H.'s was purportedly involved in was a craft shop, and the source of funds to be used for repayment of the loan was said to be profit. The security made available to [the bank] for the loan was assets and a 1999 Jeep which was said to be worth $9,000. A note appeared on the application which stated, "Has craft shop in Caseville, reference by K.P. Chief

value--$9,500.  Inventory--$15,000."

As [Defendant] knew, K.H. was not the one who was the intended recipient of the loan proceeds.  She did not sign the note or the officer's check for the loan proceeds.  She had signed a loan application which she believed was for the financing of her Jeep.  She did not own any inventory or working capital for a craft shop.

K.P. was interviewed by investigators.  He advised it was [Defendant's] idea to put loans in K.H.'s name and to use  the operation of the craft shop as the stated loan purpose.  This was done because K.P. did not qualify for additional credit at that time.  Additionally, [Defendant] instructed K.P. to cash the officer's check for the proceeds at [a different bank] or at another . . . location [of the bank].

A Suspicious Activity Report prepared by [the bank's] senior vice president in November of 2005 in connection with this offense stated, "This action appears to have been an act of collusion between the lender, [Defendant,] and the ultimate receiver of funds, K.P., without the knowledge of the borrower, K.H."

Counts 50 through 52 were processed in the same way without the knowledge of K.H.  Count 50 was for a business loan.  K.H. did not own or manage a craft shop or any other business at the time of these loans.

In Count 51, the stated purpose of the loan was the financing of a 2005 GMC Sierra pickup truck.  The application stated K.H. was self-employed at a craft store.  In actuality, as indicated, K.H. was not employed at a craft shop.  The officer's check for the loan proceeds bears the signature of K.H. as converted to an officer's check made payable to K.P.  The check made payable to K.P. was deposited into an account at [another bank] on April 29, 2005.  The GMC Sierra referred to in this loan application was already owned by K.P. and his wife and had been financed by GMAC one month prior to origination of this loan.

The stated purpose for Count 52 was for a loan to finance the purchase of a 2005 GMC pickup.

Counts 53 through 73 deal with various business loans and business renewal loans which [Defendant] approved for K.P. and S.P., K.P. alone, and S.P. alone.  The total of all these loans was $927,949.62.

Count 53 involves a business loan to K.P. and S.P.  The loan application had been filled out with historical information about K.P. and S.P. by [Defendant] and was signed by K.P. and S.P.  The stated purpose of the loan was for equipment for a restaurant they were operating.  The source of funds to be used for repayment of the loan was fire insurance (K.P. had earlier operated a restaurant in the thumb area of Michigan which had burned down).  Part of the sworn statement signed by K.P. was

that the loan was to be used solely for business purposes.

Count 54 was a business renewal loan to K.P. and S.P. The loan application stated the purpose of the loan was for equipment, and the type of business activity they were involved in was a restaurant. The security being made available to [the bank] for the loan was said to be K.P.'s real estate mortgage. A sworn statement provided as part of the loan process indicated the proceeds of the loan were to be used solely for the stated business purposes.

Count 55 involves another business renewal loan to K.P. and S.P. Again, the stated purpose of the loan was for equipment for the restaurant and the source of funds to repay the loan was profits.

Count 56 is a business renewal loan to K.P. and S.P. listing the specifics as outlined above.

Although K.P. and S.P. did operate a restaurant for periods of time when this and other credit applications were made, the proceeds from the original loan were not intended to be used solely for equipment or operating a restaurant business. The restaurant referred to in these counts was owned by [the property owner], who rented the premises to K.P. and S.P. [The owner] was not aware that K.P. had pledged much of the restaurant's property as collateral for these loans. Since K.P. did not own the building or any of the property, he could not legally use them as collateral.

During the course of the investigation, [the property owner] was asked his opinion on the debt load a restaurant of this size could handle. [He] calculated the debt load to be $18,000 to $20,000. All the loans questioned here were much larger than this amount. Through later investigation, it was determined the restaurant in question earned approximately $47,000 to $50,000 annually in gross revenue. Based on this information, [the bank] determined that based on K.P. and S.P.'s combined income, the maximum debt they could carry was $42,000. The outstanding loans issued by [Defendant] to K.P., S.P., and K.H., Counts 49 through 74, total approximately $972,269.62.

Count 57 involves a business loan to K.P. The stated purpose of the loan was the operation of a catering business. The loan application form was signed by K.P. At the time this transaction was created, [Defendant] knew the loan proceeds were not intended to be used solely for the operation of the catering business. In actuality, the proceeds from this loan were used by K.P. to make payments to a car dealership. K.P. told investigators he did not request loan proceeds for any type of catering business and that the loans were for his personal expenses. He did indicate his wife had a catering business she operated during the summer months. She worked at a school during the school year and did the catering only in the summer. In addition, he did not request any loan proceeds on her behalf.

Count 58 and 59 involved business renewal loans to K.P. by himself. The loan application was signed by K.P. and indicated the loan was to be used for the operation of their restaurant. As per K.P., the loan was not intended to be used for equipment or operating a restaurant or catering business.

Counts 60 through 62 were business loans. Counts 60 and 62 were loans to K.P. and S.P. and Count 61 involved K.P. alone. The stated purpose of the loan in Count 60 was to "build home." The source of funds and repayment of the loan was said to be profits and the sale of real estate mortgage. The security made available to [the bank] for the loan was said to be K.P. and S.P.'s real estate mortgage. Count 61 listed the purpose of the loan was for building inspections. Again, this was related to the restaurant business of K.P. Count 62 was a business loan to K.P. and S.P., with the purpose of the loan being "build home construction REM." Again, this related to the restaurant business. At the time of all these loans, K.P. and S.P. were not involved in any building adventures related to K.P.'s restaurant business and had not incurred any business building expenses at the time of their loan applications. Loan proceeds were not intended to be used solely for building expenses and personal residence. The loan in Count 62 was part of a series of eight loans. The loan proceeds were used to pay off the previous loans.

K.P. told investigators during this period there was no building ventures that he engaged in relating to his restaurant. He had not purchased any building supplies and did not have any building inspection fees for his business or for his personal residence.

Counts 63 through 73 all relate in one fashion or another to business loans which [Defendant] approved for either K.P., S.P., or K.P. and S.P. filing together. All of these loan applications were completed by the defendant and signed by K.P. and S.P. In all cases, the intended use of the loan was for something different than indicated on the loan application.

Counts 74 and 75 involve false entries or statements to bank records by a bank official or employee. Count 74 involved [Defendant] preparing or causing to be prepared a personal financial statement for K.P. and S.P. This statement showed that K.P. and S.P.'s assets included an insurance claim in the sum of $20,000. This financial statement was placed in the loan file for K.P. and S.P. At the time, K.P. and S.P.'s loan file included multiple business and personal loans and lines of credit. K.P. and S.P. did not have any insurance claims as of the date of the financial statement, February 8, 2004. K.P. and S.P.'s restaurant in Port Austin, Michigan, had burned down in August 2002. [They] received two or three insurance claims related to the fire, one for $75,000, a second for approximately $150,000, and possibly a third for a smaller amount. These were received sometime in 2003, approximately a year after the fire. All claims were received prior to the February

2004 financial statement.

Count 75 involves the same type of behaviors as listed in Count 74. At some point [Defendant] requested that K.P. provide him with financial statements. K.P. obtained this information from their accountant and gave it to [Defendant]. K.P. advises he did not review the statement before giving them to [Defendant]. He did not know if [Defendant] changed the values on the statements as listed by his accountant. K.P. previously had owned property in Gaylord but had lost it in 2004. K.P. advised [Defendant] of this, but according to K.P., [Defendant] said he was still going to use it as collateral for a loan. This financial statement was placed in K.P.'s loan file. A financial statement dated February 28, 2005, represented K.P.'s assets as including a 401K plan valued at $15,000; real estate titled "up north lots" valued at $40,000; real estate titled "sweetie's lot" valued at $110,000; personal property valued at $20,000; and other assets valued at $76,000. In actuality, K.P. did not have a 401K plan or any ownership interest in the "up north" or "sweetie's" lots as of the date set forth in the financial statement. Furthermore, although K.P. owned two vehicles valued at approximately $30,000 in total, both had been financed through another financial institution. He did not have other personal property or assets valued at $20,000 or $76,000 as indicated on his financial statement. (PSR ¶¶ 65-85.)

Defendant's Position as to Counts 49-75:

As previously noted, loans are greatly overstated in Paragraph 72 and they are not a total of $927,949.62, but rather $317,460.00. Paragraph 73 refers to some historical information and should indicate that K.P. and S.P.'s restaurant in Port Austin had been a very successful business operation, but unfortunately had burned down and the stated purpose was to create a new restaurant in Caseville comparable to the restaurant they had lost in Port Austin. This Paragraph should indicate that renewals of this loan and subsequent business loans were all consolidated so that the loans stated in Counts 53 – 67 no longer exist, but were either paid or consolidated into the loans outlined in Counts 68 – 73.

Paragraph 74 – 76 should merely indicate that these Counts referred to loans that were subsequently consolidated into later loans and no longer exist.

Paragraph 77 indicates a [particular] property owner [by] name[] . . . . [The person identified by Probation as the owner] was merely a cook who worked for K.P. in his Caseville Restaurant. The owner of the property is [another person] and not [the person identified by Probation as the owner] and anything that [the alleged owner] may have had to say is not relevant to these proceedings. Any reference to him should be eliminated from Paragraph 77 and 78. Stating that [the bank] relied on statements from [the alleged owner], no more than an employee of K.P., in ludicrous and should not be part of the Probation Officer's records. In any event, Paragraph 78 repeats an outrageously large sum of money, which is incorrect and, in fact,

$317,460.00. The statements made on the applications were those provided by K.P. [Defendant] had been well aware of the success that K.P. had with his restaurant in Port Austin and had no reason to believe that he would not be just as successful with a restaurant in Caseville. Hindsight is always better than foresight and [Defendant] has explained to the best of his ability to the FDIC in his letter that he believed in K.P. and his ability to run a prosperous business, but he turned out to be wrong. What caused K.P. to go astray is unknown to [Defendant], although it now appears that a relationship with K.H. was part of the problem, all of which came to light after the fact. [Defendant] acknowledged in a proper fashion K.P.'s loans were reviewed by loan committees and other officers in the [b]ank and were approved and it was not until [Defendant] left the [b]ank that the [b]ank decided to file some reports and state there were problems with K.P. and S.P.'s loans. Counsel has had an opportunity to read a deposition taken of K.P. in regards to a civil suit brought against him by [the bank] and finds K.P. to be a person with either a very bad memory or a person who has a great deal of difficulty in telling the truth.

Counts 76-81: Business Loans to D.S.

[Defendant] became employed as a loan officer at Northstar Bank in Bad Axe, Michigan, in mid-September 2005. Counts 76 through 80 involve business loans to D.S. The stated purpose of the loan was for cattle and expenses to their farming. In actuality, D.S. was not involved in the farming business or contemplating doing so. The total amount of loans issued to D.S. through Northstar Bank was $87,005.26.

Count 81 involved a business loan from Northstar Bank to C.J. The representation on the loan application concerning farming was false. C.J. and M.J. were interviewed during this investigation. Both stated they had never operated a farm. M.J. and C.J. did state that for approximately six months during 2002 or 2003, they had raised approximately 13 calves for fun and not for profit. This was when they were living in Decker, Michigan. They did not own or rent any equipment and had never requested a loan for purchasing these cattle. During questioning, C.J. stated that you often "just put down whatever" on loan applications to ensure that they were processed. C.J. further stated that without [Defendant] making notations on their files, that she and her husband would not have otherwise qualified for the loans based on their income. M.J. and C.J. further stated they were unaware the loan documents had represented they had a farming operation and were raising cattle.

When [Defendant] left [the bank], a new loan officer came to M.J. and C.J.'s home and asked to see the cattle operation. C.J. advised the loan officer there was no such operation. At this time, C.J. owed [the bank] approximately $128,000 to $138,000. . . . [T]he new loan officer, asked if they wanted to refinance their mortgage loan to pay off their debt. M.J. and C.J. eventually obtained a loan through [Defendant] at Northstar Bank to refinance the mortgage to pay off the debt at [the bank].

According to investigators, Northstar Bank suffered no losses in regard to these matters.  (PSR ¶¶ 86-89.)

Defendant's Position as to Counts 76-81:

The statements in Lines 4 and 5 [of ¶ 86] are incorrect as previously noted in this report.  D.S. and C.S. had been dairy farmers who had gone through bankruptcy, but continued to raise heifers or steers and were ultimately going to and did remodel a home which is being used as a foster care home with the intentions of continuing to raise some heifers and steers on the property.  The actual loan totals in 76 – 80 is $51,190.26 as Counts 76 and 77 are consolidated into the loan indicated in Count 79. These loans are all converted into a Mortgage note and no longer exist and the Mortgage note is being amortized.  This information should be reflected in the Probation Officer's report.

In regards to Paragraph 87, [Defendant] stated on the application what he was told by M.J. and C.J.  He is also aware that M.J. and C.J. were assisting C.J.'s sisters and her mother D.S., and to [Defendant's] knowledge were all in one manner or another involved with raising heifers or steers and it is disingenuous for M.J. and C.J. to say they were unaware what the loan documents stated when they signed same which is certainly not a fault of [Defendant].  As is subsequently indicated, this Paragraph should reflect that the loan in Count 81 no longer exists.

In regards to Paragraph 88, why this information is contained in this report makes no sense as it is totally irrelevant.  [Defendant] was never at M.J. and C.J.'s home and M.J. and C.J. owe no money to [the bank] and the Count 81 loan has been paid in full and M.J. and C.J. are amortizing a Mortgage with regular payments at Northstar Bank and as Paragraph 89 indicates, Northstar Bank suffered no losses in regards to Count 81.

Count 82: Misapplication of Funds between CS and DS's Account and KP's Account

Count 82, the embezzlement count for which the defendant entered a nolo contendere plea, relates to a July 29, 2005, incident in which [Defendant] executed a draw of $4,500 on a commercial line of credit account of D.S. and C.S., [the bank] patrons. [Defendant] then immediately deposited the funds into K.P.'s account.  The draw of $4,500 was accomplished without the knowledge or approval of either D.S. or C.S. and was done to benefit K.P.  (PSR ¶ 90.)

Thus, the PSR subdivides the 82 counts against Defendant into several series of dealings with particular bank borrowers. Defendant, in his turn, objects that many of the descriptions of those dealings are incomplete and he purports to offer a more complete set of information for the Court's

consideration.

III.

Defendant's statement to Probation and his objections to the PSR raise a series of legal issues. First, the Court must inquire into the effect on his plea of Defendant's version of events, as presented to the probation officer, and a different version of events previously offered to the Court as a basis for his plea of nolo contendere. These issues include the following: (1) whether a defendant who has offered a stipulated set of facts in support of a no contest plea may offer a contradictory version of events – that asserts his innocence – to a probation officer preparing a presentence report; and (2) whether such a version of events justifies denying a defendant the two-level reduction for acceptance of responsibility, under U.S.S.G. § 3E1.1.

Second, the Court must consider several issues relating to the determination of a loss amount under U.S.S.G. § 2B1.1. These issues include the following: (1) whether the conduct in counts 1 through 81 of the third superseding information constitute relevant conduct under U.S.S.G. § 1B1.3, for purposes of calculating the victim's, i.e., the bank's, "loss;" (2) the nature of the government's burden of proof to establish a violation of law and Defendant's responsibility for the loss; (3) what effect, if any, the bank's unconditional release of Defendant's civil liability in exchange for a payment of $35,000 has on the calculation of the loss; (4) whether refinanced loans should be included in the loss amount; (5) what credits, if any, should be applied against the loss amount; and (6) whether Defendant derived more than $1 million in gross receipts from the bank, under U.S.S.G. § 2B1.1(b)(13).

Third, the Court must consider whether Defendant abused a position of trust, under U.S.S.G. § 3B1.3.

Fourth, at least two issues regarding restitution require attention: (1) whether the Court may impose on Defendant a restitution obligation when he received no financial benefit from his illegal activities; and (2) whether the Court may impose on Defendant a restitution obligation when the putative victim has voluntarily settled its corresponding claim of civil liability and released Defendant.

IV.

A.

1.

Federal Rule of Criminal Procedure 11(b)(3) provides, "Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." Federal Rule of Criminal Procedure 11(b)(1) & (2) requires the court to advise the defendant of several criminal procedural rights and consequences of the plea, as well as to ensure that the plea is voluntary. "The purpose of this requirement [to establish a factual basis] is to ensure the accuracy of the plea through some evidence that a defendant actually committed the offense." *United States v. Tunning*, 69 F.3d 107, 111 (6th Cir. 1995) (citation and internal quotations omitted). Consequently, even when a defendant voluntarily pleads guilty, the court has an independent obligation to ensure the integrity of the criminal justice system by determining that a factual basis supports a criminal conviction.

A defendant, however, may face pragmatic considerations as well, such as reservations about the likelihood of persuading a jury of innocence, the cost necessary to mounting a successful defense, or the severity of the consequence of a guilty verdict. *See, e.g., Alford v. North Carolina*, 400 U.S. 25 (1970) (permitting a defendant to insist on his innocence while entering a guilty plea, in part, to avoid the death penalty). Indeed, concerns about the accuracy of the criminal justice

system to differentiate between not guilty and guilty conduct might prompt a defendant to enter a plea other than innocent for practical reasons. *See* Frank Weir, "Non-DNA Innocence Project," Detroit Legal News (May 12, 2008).

Federal Rule of Criminal Procedure 11 preserves an avenue for a defendant to make such a plea. Besides permitting pleas of guilty or not guilty, the rule includes a third plea of nolo contendere, or no contest. Both subsections (1) and (2) to Rule 11(b) specifically refer to a plea of either guilty or nolo contendere. Similarly, Rule 11(c)(1), (d), and (e) also specify two types of pleas: guilty or nolo contendere. Yet the express language of Rule 11(b)(3) refers only to a guilty plea, but not to a nolo contendere plea. Thus, at only one point in Rule 11 is reference to a nolo contendere plea absent – in the requirement to establish a factual basis for the plea.

In *Alford v. North Carolina*, 400 U.S. 25 (1970), the Supreme Court confirmed that entry of plea of guilty, coupled with an assertion of innocence, comported with the Constitution. There, the Court held, "[T]he Constitution does not bar imposition of a prison sentence upon an accused who is unwilling expressly to admit his guilt but who, faced with grim alternatives, is willing to waive his trial and accept the sentence." *Id*. at 36. In reaching this determination, the Court noted the "strong factual basis" that supported it. *Id*. at 38. Thus, although the defendant made a statement to the trial court, i.e., that he had not shot the victim, that contradicted the prosecutor's statement of the facts, the court could still accept a plea of nolo contendere to second degree murder.

Although *Alford* did not involve a nolo contendere plea, the Court did draw on those precedents in reaching its determination. In so doing, it observed,

> [Federal Rule of Civil Procedure 11] preserves this distinction [between an admission of guilt and mere consent to punishment] in its requirement that a court cannot accept a guilty plea "unless it is satisfied that there is a factual basis for the plea"; there is no similar requirement for pleas of *nolo contendere*, since it was

> thought desirable to permit defendants to plead *nolo* without making any inquiry into their actual guilt. *See* Notes of Advisory Committee to Rule 11.

*Id.* at 36 n.8. As there cited, the Note to the Advisory Committee to Rule 11 of 1966 stated, "For a variety of reasons it is desirable in some cases to permit entry of judgment upon a plea of nolo contendere without inquiry into the factual basis for the plea." *See also* 24 Moore's Federal Practice 3d § 6110.02[2][b] (2006) (describing the Supreme Court's decision in *Alford* as distinguishing between the two types of pleas based on "the absence of a factual basis requirement for nolo contendere pleas").

In *United States v. Tunning*, 69 F.3d 107, 110-111 (6th Cir. 1995), the Sixth Circuit implicitly recognized this distinction when it emphasized that an *Alford*-plea requires a plea of guilty, notwithstanding the possibility that a defendant may still "affirmatively protest[] his innocence or . . . refuse[] to admit to acts constituting the crime." *Id.* at 112; *see also United States v. Kathman*, 490 F.3d 520, 522 n.1 (6th Cir. 2007) (differentiating between an *Alford*-plea and a nolo contendere plea, as an *Alford*-plea requires a plea of guilty). In its holding, the court in *Tunning* concluded that Rule 11 required the same inquiry for a factual basis for an *Alford*-plea as for a guilty plea. *Id.* at 111-112. Because an *Alford*-plea is defined as including a plea of guilty, notwithstanding other contrary assertions, the court's holding that a factual basis is required need not extend to nolo contendere pleas.[6]

Here, Defendant did provide a factual basis for his nolo contendere plea through his

---

[6]The Seventh Circuit, however, has found that the "better practice" is to establish the factual basis for a nolo contendere plea as well, such as by inquiring of the prosecutor as to the facts, because "a plea of guilty and a plea of nolo contendere have the ultimate effect of admitting all material facts alleged in the charge." *Ranke v. United States*, 873 F.2d 1033, 1037 (7th Cir. 1989) (citations omitted).

attorney's stipulation of facts. Defendant later provided a contrary statement to Probation in which he maintained that he did not engage in the conduct that formed the basis of his plea. This contradiction need not undercut the validity of his plea, however. First, Rule 11 does not require a factual basis for a nolo contendere plea. Indeed, the rule refers jointly to guilty and nolo contendere pleas throughout its provisions, with one exception. The provision that requires the establishment of a factual basis for the offense applies only to guilty pleas and not to nolo contendere pleas Second, the Supreme Court in *Alford* permitted a plea of guilty, notwithstanding the defendant's continued assertion of his innocence. If a nolo contendere plea need not include a factual basis at all and if a guilty plea can exist even with a defendant's contrary assertion, then Defendant's later negation of the factual basis for his plea does not disturb that plea. Although Defendant contradicted the factual basis for his nolo contendere plea in his statement to Probation, that contradiction does not affect the validity of his plea.

### 2.

The continuing validity of Defendant's nolo contendere plea, however, does not resolve whether his contrary description of a version of events justifies denying him a guideline reduction for acceptance of responsibility, under U.S.S.G. § 3E1.1. U.S.S.G. § 3E1.1 provides that, "if the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by two levels." In *United States v. Greene*, 71 F.3d 232 (6th Cir. 1995), a defendant admitted his criminal conduct but, in his discussion with the probation officer, denied the intent element. The probation officer recommended that the defendant had not demonstrated acceptance of responsibility, a recommendation that the trial court accepted. The Sixth Circuit affirmed that sentencing determination, because the court concluded that an excuse for illegal conduct can show

-35-

an unwillingness to accept culpability. *Id*. at 235; *see also United States v. Whitman*, 209 F.3d 619, 622 (6th Cir. 2000) ("A false statement about a material fact to a probation officer may, by itself, justify a finding that a defendant has failed to accept responsibility.") (citing *Greene*, 71 F.3d at 234).

Here, Defendant entered a plea of nolo contendere, which does not require him to admit guilt. Yet a reduction in sentencing level based on acceptance of responsibility requires just that – acceptance of responsibility. Regarding the offense of conviction, however, Defendant offered a statement in which he describes his belief that he incurred no culpability for the misapplication of bank funds. Consistent with his nolo contendere plea, Defendant is entitled to believe that he can offer a reasonable explanation for the fact that funds for one borrower were applied to a different borrower. In light of *Greene* and *Whitman*, the Court can refuse to credit him with acceptance of responsibility, particularly where he offers an excuse for his conduct, rather than accepts it. Accordingly, to the extent that Defendant maintains his innocence with respect to count 82, the Court will accept Probation's recommendation and deny Defendant any reduction under U.S.S.G. § 3E1.1.

## B.

### 1.

Several issues implicated in determining the loss amount require attention. U.S.S.G. § 1B1.3(a)(2) permits a court to consider, as relevant conduct, all acts and omissions "that were part of the same course of conduct or common scheme or plan as the *offense of conviction*." (Emphasis added.) Although so fundamental as to receive little attention in the decisional law, the plain text makes clear that this conduct must pertain to the offense of conviction, itself a violation of law. *See*

*United States v. Cross*, 121 F.3d 234, 238-239 (6th Cir. 1997) (requiring resentencing where illegal conduct, torture, on a different date was unrelated to offense of conviction, drug distribution, and without effect on the offense of conviction). "Relevant conduct" requires conduct or a scheme or plan similarly oriented toward the same or a like offense, not simply conduct of a like character that has only an attenuated link to illegality.

The relevant conduct determination sets the base offense level, as well as the specific offense characteristics. U.S.S.G. § 1B1.3(a)(i), (ii). The parties and Probation reach different conclusions as to the appropriate base offense level. The government maintains that the base offense level is 7, Defendant places it at 6, and Probation recommends that it is 16.

A court has broad discretion in what it considers relevant conduct. In *United States v. Watts*, 519 U.S. 148, 153-154 (1997), the Supreme Court stated that a sentencing court may consider all related conduct, including conduct that did not result in a conviction. *See also United States v. Hough*, 276 F.3d 884, 898 (6th Cir. 2002) ("The court is given wide discretion in what it may consider as relevant in implementing [U.S.S.G. § 1B1.3]."). In *Hough*, the Sixth Circuit upheld a trial court's consideration of a defendant's prior juvenile offenses, even though the federal court did not have jurisdiction over those offenses, because the conduct at issue was part of the same course of conduct.

Application Note 9(A) to U.S.S.G. § 1B1.3 defines a "common scheme or plan" as "substantially connected to each other by at least one common factor, such as a common victims, common accomplices, common purpose, or similar *modus operandi*." Application Note 9(B) to U.S.S.G. § 1B1.3 defines the "same course of conduct" as "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of

offenses." *See United States v. Chichy*, 1 F.3d 1502, 1510 (6th Cir. 1993) (affirming a trial court's consideration of fraudulent loans made by a co-defendant, where the loans were part of a common scheme or plan or the same course of conduct).  A court should consider the similarity between offenses, the regularity or repetition of offenses, and the time interval between offenses.  *Id.*; *see also United States v. Hill*, 79 F.3d 1477, 1482 (6th Cir. 1991).  Absent one of these factors, a court should look for a greater showing of one of the other factors.  Application Note 9(B) to U.S.S.G. § 1B1.3.

Here, from 2002 to 2005, Defendant, on behalf of the bank, made a volume of loans to and engaged in transactions with a variety of borrowers.  As asserted in the third superseding information and the PSR, these loans and transactions included withdrawals against another borrower's credit line and the issuance of a loan based on a modified financial statement.  Most significantly, in a variety of forms, Defendant issued loans or created credit lines for non-existent businesses, for purposes other than stated in the loan application, or to someone other than the listed borrower.  When Defendant issued all of these loans, however, he had an immediate supervisor and the bank's discount committee either reviewing his loans or applying control standards the bank selected.  Any losses that occurred were incurred by the bank, but a preponderance of the evidence has not yet demonstrated that all, or any, of the losses identified in counts 1 through 81 of the information resulted due to Defendant's conduct.  While similarities exist between the conduct of those 81 counts and the conduct in count 82, such as the same injured party and a like *modus operandi*, similarity alone does not demonstrate a "*course* of conduct" or a "common *scheme or plan*," if the same outcome might follow from overworking an employee or from inadequate internal controls at the bank.  Including relevant conduct in a sentencing determination requires a connection

between that conduct and the offense of conviction. The linkage to the offense of conviction rests on conduct that similarly involves wrongdoing, and not mere error. Consequently, the Court will require additional evidence to determine whether any or all of the conduct alleged in counts 1 through 81 constitutes "relevant conduct" to the offense of conviction of misapplication of bank funds.

2.

U.S.S.G. § 2B1.1(b)(1) provides for an increase in the base offense level based on the amount of the loss. Application Note 3(A) defines loss as "the greater of actual loss or intended loss that resulted from the offense." "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." Application Note 3(A)(i). "'Intended loss' . . . means the pecuniary harm that was intended to result from the offense . . . and . . . includes intended pecuniary harm that would have been impossible or unlikely to occur . . . ." Application Note 3(A)(ii).

As to determining the loss, "[t]he court need only make a reasonable estimate of the loss." Application Note 3(C). *See also United States v. Lutz*, 154 F.3d 581, 590 (6th Cir. 1998) ("In determining the loss for sentencing purposes, a district court need only make a reasonable estimate of the loss, and this court reviews for clear error and reverses the valuation only if it is outside the realm of permissible computations.") (citation omitted).

The court must exclude from the loss, however, interest, finance charges, late fees, penalties, other similar costs, and costs incurred by the government or victims in prosecution and investigation. Application Note 3(D). A court must further reduce the amount of loss based on the amount of money returned by the defendant (or others acting jointly with the defendant) before the loss was detected. Application Note 3(E)(i). The time of detection is defined as the earlier of the discovery

of the offense or when the defendant knew or reasonably should have known that the offense was, or was about to be, discovered. *Id.* Similarly, in the case of collateral pledged or provided by the defendant, a credit must be applied based on the fair market value or disposition amount of the collateral at the time of sentencing. Application Note 3(E)(ii). Notably, both of these bases for reducing the amount of the loss turn on the defendant's own efforts or own collateral, not the efforts or collateral of a third party.

The Sixth Circuit has interpreted and applied U.S.S.G. § 2B1.1, as well as U.S.S.G. § 2F1.1, which governed offenses involving fraud or deceit prior to its deletion in 2001. Application Note 8 to U.S.S.G. § 2F1.1 of 2000 expressly refers to the commentary to U.S.S.G. § 2B1.1 to determine the amount of a loss, and the note comments that the loss amount in a fraud case is frequently the same as in a theft case. The provisions unique to fraudulent loan applications, cited in Application Note 8(b) to U.S.S.G. § 2F1.1 of 2000,[7] such as the establishment of the loan loss amount at the time of discovery of the offense, the reduction for recovery by a lending institution, and the use of the greater amount of either the actual or intended loss, are largely preserved in the current commentary to U.S.S.G. § 2B1.1 at Application Note 3(E). Accordingly, relying on case law interpreting former U.S.S.G. § 2F1.1 to understand loss amount determinations under U.S.S.G. § 2B1.1 is reasonable.

In *United States v. Lucas,* 99 F.3d 1290 (6th Cir. 1996), the court considered U.S.S.G. §

---

[7]Application Note 8(b) to U.S.S.G. § 2F1.1 of 2000 provides:

In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used.

2F1.1 as applied to that particular case, but also circumscribed earlier decisions to their factual parameters. The court did not eliminate, but merely limited, exceptions created for determining loan loss amounts whose proceeds went to a third party, as in *United States v. Chichy*, 1 F.3d 1502 (6th Cir. 1993), and for loans subject to a contractual right of setoff from another account at the lending institution, as in *United States v. Wright*, 60 F.3d 240 (6th Cir. 1995).

In *Chichy*, a real estate agent and a mortgage loan officer conspired to aid their clients in securing federal loans with falsified documentation. In applying then-extant U.S.S.G. § 2F1.1 and its commentary, the court stated that "fraudulently induced bank loans should be based on the 'actual' or 'expected' loss rather than on the face value of the total amount of the loan proceeds." *Chichy*, 1 F.3d at 1508 (citations omitted). Because none of the loans at issue there had proceeded through the full cycle to recover any losses (default, foreclosure, claim payment, and sale) and because of the anticipated years to reach that conclusion, the appellate court affirmed the trial court's reliance on average estimates as proxy for the losses suffered by the federal agency issuing the loans. *Id*. at 1509-1510.

In *Wright*, the Sixth Circuit concluded that no loss occurred on three loans and, so, reversed a sentence issued under U.S.S.G. § 2F1.1. On two loans, the bank exercised its right to foreclose on property subject to a mortgage or to a set off from another account, such that the bank recovered any losses. On the other loan, the defendant was not the actual debtor, and the bank succeeded in securing sufficient collateral for the loan from the debtor. The court proceeded to remark, in dicta:

> [T]he word "loss" means and includes the money a court may require as restitution and it means money which others may pay, but are not obligated to pay, on behalf of the defendant. "Loss" should not include amounts that a bank can and does easily recover by foreclosure, setoff, attachment, simple demand for payment, immediate recovery from the actual debtor and other similar legal remedies, including the sale of a "pledged" asset covered by the example.

*Wright*, 60 F.3d at 242.

The *Lucas* court criticized these decisions as inconsistent with the commentary to the Sentencing Guidelines and limited these decisions to their facts. In particular, the court disapproved of the "troubling" dicta above. *Lucas*, 99 F.3d at 1297-1299. There, the court construed *Chichy* as applying only to cases where the proceeds from fraudulently obtained loans went to a third party, rather than to the defendant. Further, the court construed *Wright* as pertaining to monies recovered due to the defendant's own efforts before discovery of the fraud. *Id*. at 1298-1300. In emphasizing that a key issue in assessing a loss amount is whether a defendant's efforts to return funds precedes discovery of the fraud, the court stated:

> Recovery of fraudulently obtained money or property by the coercive actions of the state, whether these actions occur years after or immediately after the fraud is discovered, cannot be used to reduce the amount of loss. Whatever mechanism the government uses to assist recovery after a fraud is discovered, the scope of the defendant's fraud remains unaltered. Such governmental action is unrelated to the defrauder's conduct and may never occur, whereas the scope of the fraud is limited from the outset in cases where the defrauder himself first acts to constrain the magnitude of the money or goods that he can fraudulently obtain.

*Id*. at 1299. Consequently, the recovery of lost monies by someone other than the defendant, or repayment by the defendant after discovery of the fraud, does not reduce the amount of the loss. The amount of the fraud is what sets the amount of the loss.[8] The loss amount, then, is arguably the amount subjectively intended as the loss by the defendant, i.e., "the amount the defendant intended not to repay." *United States v. Moored*, 38 F.3d 1419, 1427 (6th Cir. 1994). A victim's purported failure to mitigate does not require a trial court not to attribute the full amount of a loss to a

---

[8]*But see United States v. Lutz*, 154 F.3d 581, 590 (6th Cir. 1998) (citing to *Lucas* for the rule that "[t]he loss in a fraudulent loan application case is the amount of the loan not repaid, reduced by the amount the lending institution has recovered from any assets pledged to secure the loan").

defendant. *United States v. Lutz*, 154 F.3d 581, 590 (6th Cir. 1998) (citation omitted).

Again applying U.S.S.G. § 2F1.1, the Sixth Circuit rejected the contention that the loss amount is the defendant's gain, rather than the loss of the victims. *United States v. Wolfe*, 71 F.3d 611, 617 (6th Cir. 1995). More importantly, the appellate court refused to require the trial court to wait for the outcome of bankruptcy proceedings, where the bankruptcy estate might recover funds that would then be received by the victims. The Sixth Circuit emphasized the difference between funds recovered by a third party, such as the bankruptcy estate, and those recovered through the defendant's own efforts. *Id.* at 618-619. The loss amount was not affected by the possibility that the bankruptcy had or might yet recover on some of the losses suffered by the victims. The court further underscored the impracticality of speculating about future monies to be awarded or delaying sentencing pending other proceedings. *Id.*

Applying the foregoing to the instant case leads to several conclusions. First, the government does not bear a burden of proof for the court's sentencing determinations, as the court must reach its own conclusions, particularly where, post-*Booker*, the Sentencing Guidelines are advisory. Application Note 3(C) to U.S.S.G. § 2B1.1 provides that the court estimates the loss and receives "appropriate deference" in so doing. Yet either the government or a defendant may seek to persuade the court of their views and, in so doing, they should be mindful that the court must reach its decision based on a preponderance of the evidence. Second, based on *Wolfe*, 71 F.3d at 617-619, in which a bankruptcy estate's prospective ability to recover on fraudulent loans did alter the loss amount for criminal sentencing, Defendant's settlement with the bank prior to these proceedings does not affect the assessment of his loss amount here. The defendant's own actions prior to discovery of the loan losses can serve to reduce the loss amount for sentencing. The

separate actions of a third party – here, the bank – do not diminish the loss, because the loss is determined as of the time of the discovery of the offense or when a defendant knew or reasonably should have known of its discovery.

Based on Application Note 3(A)(i) to U.S.S.G. § 2B1.1, only the actual loss should be included in the loss amount. (Here, any measure of an "intended loss" is irrelevant, where fraudulent loan applications resulted in loans for the amounts requested.) In the circumstance of a refinanced loan, only the subsequent loan should be included in the loss amount. Because a refinanced loan subsumes the prior loan, no loss accumulates based on the amount of the prior loan. Thus, only the value of the refinanced loan, rather than the prior or initial loan, counts toward the determination of the loss.

Finally, based on the credits enumerated in Application Note 3(E), Defendant is not eligible for any of them. Both credits, based on return of the property or on collateral to secure the loss, require the activity of the defendant. Recovery by a third party or reliance on collateral of a third party does not bring Defendant within the plain text of the Note. Had Defendant returned any funds lost to the bank or had he provided some collateral to the bank, his loss amount might be reduced. Absent some showing on either of these points, however, the loss amount is established as of the time of the discovery of the loss. Nor does the possibility of some later recovery by a third party affect the determination of the loss amount. Accordingly, the loss amount under U.S.S.G. § 2B1.1(a) for Defendant's sentence is based on the actual amount lost by the bank on loans (thus, excluding prior loans paid off through refinanced loans), with credits based only on repayments by Defendant prior to the discovery of the offense, as this case does not involve Defendant's collateral to secure the loans.

U.S.S.G. § 2B1.1(b)(13) provides for a two-level increase of the offense level if a defendant derived more than $1 million in gross receipts from a financial institution as a result of an offense. Application Note 11 states that a defendant falls into this provision "if the gross receipts to the defendant individually, rather than to all participants, exceeded $1,000,000." The note further defines "gross receipts" as property "obtained directly or indirectly" as a result of the offense.

In *United States v. Gharbi*, 510 F.3d 550, 554-558 (5th Cir. 2007), the Fifth Circuit reversed the lower court's sentencing under U.S.S.G. § 2B1.1(b)(13), where the lower court reduced the total receipts to the amount of money that the defendant retained after he paid off a mortgage and other associated costs. The Fifth Circuit held that the amount of his "gross receipts" was the total amount of the fraudulent loan by which he was able to purchase a property by paying off a pre-existing lien. *Id*. In dicta, the court commented that the gross receipts figure for another property might be reduced, in the event that some of the monies were disbursed to a co-conspirator, rather than to the defendant. *Id*. at 557.

Consistent with that consideration, the Seventh Circuit in *United States v. Castellano*, 349 F.3d 483, 485-486 (7th Cir. 2003), remanded a sentencing decision for the trial court to consider whether monies received by a corporate defendant could properly be imputed to an individual defendant as his "individually" received gross receipts. *See also United States v. Widener*, 437 F.3d 1023, 1046-1047 (10th Cir. 2006) (concluding that the trial court erred by attributing the same monies to the gross receipts of two different defendants, rather than differentiating them individually); *but see United States v. Edelkind*, 467 F.3d 791, 800-802 (1st Cir. 2006) (refusing to employ a formalistic approach and including monies disbursed to the defendant's wife in the amount

of gross receipts).

The limited guidance regarding U.S.S.G. § 2B1.1(b)(13)(A) focuses on monies received, in some manner, by the defendant. To the extent that other authorities differ with each other, the concern centers on to calculate gross receipts based on who formally receives the funds or if the defendant enjoys the benefit of them, absent a formal connection to them. No authority considers applying this guideline to a person who does not retain funds formally, or who did not receive some benefit through a direct connection to the person who did formally receive them. Here, the guideline and its note require that a defendant "derive" and "obtain" the monies. The application note also states that a defendant derive them "individually," rather than attributing to a defendant the monies received by another person.

Based on this language, it is difficult to conclude that Defendant here derived gross receipts in excess of $1 million. Indeed, it appears that Defendant did not derive any monies at all, because the loan proceeds all went to the borrowers. The government has provided no evidence that Defendant received any benefit from the loan proceeds or received loan proceeds directly. Accordingly, the amount of the gross receipts that Defendant derived is zero dollars, and the two-level enhancement of U.S.S.G. § 2B1.1(b)(13)(A) does not apply.

C.

U.S.S.G. § 3B1.3, in relevant part, provides:

If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.

The guideline's reference to "trust" draws upon a body of law regarding fiduciaries and trustees.

See United States v. Ragland, 72 F.3d 500, 502-503 (6th Cir. 1996).

Application Note 1 to this guideline, in relevant part, provides:

"Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult).

The note offers as examples a lawyer who is to serve as guardian for a client's funds or "a bank executive's fraudulent loan scheme." *Id.* Yet embezzlement or theft by an ordinary bank teller or clerk would not fall within the guideline, due to the lack of discretion that that role usually has. *Id.*

"[T]he level of discretion accorded an employee is to be the decisive factor in determining whether his position was one that can be characterized as a trust position." *United States v. Tribble*, 206 F.3d 634, 637 (6th Cir. 2000). In *United States v. Berridge*, 74 F.3d 113 (6th Cir. 1996), the Sixth Circuit affirmed a trial court's conclusion that the defendant, a bank vice president, had abused a position of trust when he made false statements on a loan application. Although the bank directors and officers supervised his business decisions and although he attended regular meetings to answer questions regarding loans, his role as vice president showed that his superiors trusted him with certain responsibilities. His responsibilities included writing off and granting loans, so his conduct contrary to the authority granted in that position demonstrated an abuse of trust. *Id.* at 117; *see also United States v. Humphrey*, 279 F.3d 372, 381 (6th Cir. 2002) (holding that a bank's vault teller, who handled daily cash and food stamps, did not have a trust relationship with her employer because she did not administer its property).

Here, Defendant is not a director or officer of the bank, but neither is he a mere teller. His

degree of responsibility falls somewhere in between those positions. Defendant had some measure of discretion, in that he had the authority to write off and grant loans, but his superiors also reviewed his work. He held the position of a vice president, but that title cannot overcome a functional assessment of his role. Evidence may show that his responsibilities did not extend beyond that of a loan officer, which might place him closer to a teller in the degree of responsibility that he had. Indeed, the bank's approach to managing its employees, and to managing Defendant in particular, may inform on whether Defendant held a position of trust and elected to abuse it, or whether he simply struggled to keep pace with ever escalating responsibilities imposed by the bank. Whether Defendant did hold a position of trust with the bank will require further factual development.

### D.

Orders of restitution are governed by 18 U.S.C. §§ 3663 - 3664. 18 U.S.C. § 3663(a)(1) permits a court to issue an order of restitution, balancing the victim's loss with the defendant's financial resources, yet that balancing informs only on the decision to issue the order, not on the amount of the order. 18 U.S.C. § 3663(a)(1) also grants courts the authority to decline to issue such an order, if "the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims." This provision also expressly excepts from its scope offenses listed in 18 U.S.C. § 3663A. In contrast, 18 U.S.C. § 3663A(a) requires a court to issue an order of restitution for certain offenses. Offenses such as Defendant's plea to a count of misapplication of bank funds fall within 18 U.S.C. § 3663A(c)(1)(B): a plea agreement for any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." Despite this mandatory language, however, courts still retain some further discretion. Offenses against property under Title 18 are

exempted from § 3663A, if "the court finds, from facts on the record, that . . . determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3); *see also* U.S.S.G. § 5E1.1(a), (b) (reiterating the mandatory nature of § 3663A, the discretionary nature of § 3663, and the exception in § 3663A(c)(a)(ii)).

Consequently, the mandatory restitution provisions of § 3663A apply here, unless the Court concludes that the complexity of facts in assessing the victim's losses would unduly complicate or prolong the sentencing process beyond the need to provide restitution to the bank. In that case, § 3663, and its consequent grant of discretion to the court in determining whether to require restitution, would apply.

Regardless of whether § 3663 or § 3663A apply, the procedural mechanics of 18 U.S.C. § 3664 govern the issuance of an order of restitution. 18 U.S.C. §§ 3663(d), 3663A(d). Only the provisions of 18 U.S.C. §§ 3661 *et seq*., and Federal Rule of Criminal Procedure 32(c) provide the rules applicable to proceedings for issuing a restitution order. 18 U.S.C. § 3664(c).

Once the probation officer issues a report regarding the restitution amount, the court may require additional documentation or testimony, and the privacy of that information must be maintained to the extent possible. 18 U.S.C. § 3664(d)(4). The court resolves any dispute regarding the restitution amount by a preponderance of the evidence. The government bears the burden of demonstrating the amount of the loss, although victims cannot be required to participate in any phase of a restitution order. 18 U.S.C. § 3664(e) & (g)(1).

Regarding the amount of restitution, 18 U.S.C. § 3664(f)(1)(A) sets it at "the full amount of

each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." "[T]he fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source [cannot] be considered in determining the amount of restitution." 18 U.S.C. § 3664(f)(1)(B). Having set the restitution amount as to each victim, the court then may account for the defendant's financial situation in crafting the manner and schedule of the defendant's payment of the order of restitution. 18 U.S.C. § 3664(f)(2) - (4). 18 U.S.C. § 3664(j) provides for adjustments to the recipient or amount of restitution:

> (1) If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation.
> (2) Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in –
> (A) any Federal civil proceeding; and
> (B) any State civil proceeding, to the extent provided by the law of the State.

In *United States v. Bearden*, 274 F.3d 1031, 1040-1041 (6th Cir. 2001), the Sixth Circuit held that a civil settlement with a crime victim did not prevent a sentencing court from issuing an order of restitution. The negotiations of private parties do not bind the criminal justice system. *Id.* at 1041. Although not the subject of the court's analysis, the court commented that the amount of restitution was the loss amount reduced by the amount from the civil settlement. *Id.* at 1041-1042; *see also Federal Deposit Ins. Comm'n v. Dover*, 453 F.3d 710, 717 (6th Cir. 2007) (allowing that a civil settlement might only affect a restitution order by reducing the recoverable restitution amount by the amount of the settlement).

As to the amount of loss, "the loss caused by the conduct underlying the offense of

conviction establishes the outer limits of a restitution order." *Hughey v. United States*, 495 U.S. 411, 420 (1990). "It follows that in finding loss, a court may not consider acts for which the defendant was not convicted." *United States v. Sosebee*, 419 F.3d 451, 459 (6th Cir. 2005). While the restitution statute provides for consideration of a defendant's conduct in a scheme or pattern, that scheme or pattern must be an *element of the offense*, else the restitution amount must be limited to the amount of loss suffered due to the offense of conviction. *Id.*; *see also Ratliff v. United States*, 999 F.2d 1023, 1026 (6th Cir. 1993) ("Restitution is limited to losses caused by the specific conduct that is the basis of the offense of conviction.") (citation omitted); *United States v. Frith*, 461 F.3d 914, 920 (7 th Cir. 2006) ("Relevant conduct is not within the scope of either statute.") (citation omitted). Consequently, a restitution amount can differ from the loss amount calculated under the Sentencing Guidelines for a term of imprisonment. *See United States v. Johnson*, 440 F.3d 832, 849 (6th Cir. 2006).

Based on the foregoing, the Court may impose a restitution order on Defendant under 18 U.S.C. § 3663. The fact that Defendant has entered into a prior settlement agreement with the victim, the bank, does not prevent the Court from imposing a separate restitution order as punishment, as stated in *Bearden*. The amount of the restitution order, however, can be informed by the amount of the settlement agreement, that is, the loss amount identified for purposes of restitution can be reduced by the amount of the civil settlement. Additionally, the amount of the loss for restitution is confined to the amount of the loss for the offense of conviction. Relevant conduct, in contrast to the assessment of loss for Sentencing Guidelines purposes, does not inform on the amount of restitution, because relevant conduct is not an element of the offense of conviction.

The government states that the loss amount for the offense of conviction, that is, count 82

for the misapplication of bank funds, is $4,500.  Reducing that loss amount by the amount of the

civil settlement, $35,000, eliminates any restitution obligation.  Accordingly, regardless of whether

imposition of a restitution order is mandatory under § 3663A or discretionary under § 3663, the

restitution amount is zero dollars, pursuant to the procedure for establishing it under § 3664 and the

relevant case law.  Because the amount of restitution due on the sole count of conviction is nothing,

the Court will not issue an order of restitution.

V.

Accordingly, it is **ORDERED** that Defendant's continued sentencing hearing will occur on

**July 21, 2008** at 9 a.m.  The parties are directed to **FILE SUPPLEMENTAL BRIEFS**, on or before

**June 30, 2008**, regarding the following factual issues: (1) what conduct described in the third

superseding information, if any, comprise relevant conduct to the offense of conviction; (2) the

amount of the loss resulting from that conduct; and (3) Defendant's role and responsibilities at the

bank, so as to assess whether he abused a position of trust.  Any responses or replies shall be filed

in accordance with the local rules.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: May 19, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on May 19, 2008.

s/Tracy A. Jacobs
TRACY A. JACOBS