UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                          Case Number 07-20243-BC
                                                            Related Case Number 08-50303-BC
KENNETH E. YAROCH,                                          Honorable Thomas L. Ludington

        Defendant,

_____/

## OPINION AND ORDER RESOLVING REMAINING SENTENCING GUIDELINE ISSUES

On May 25, 2007, Defendant Kenneth Yaroch was indicted on 18 counts of bank fraud in violation of 18 U.S.C. § 1344. The government issued a superseding indictment on June 13, 2007, charging Defendant with 51 counts of bank fraud in violation of 18 U.S.C. § 1344, and one count of a false statement to a bank in violation of 18 U.S.C. § 1005. On July 11, 2007, the government issued a second superseding indictment, charging Defendant with 78 counts of bank fraud in violation of 18 U.S.C. § 1344, and three counts of a false statement to a bank in violation of 18 U.S.C. § 1005. Finally, on December 21, 2007, the government issued an eighty-two count, third superseding information against Defendant. The third superseding information charged Defendant with the same 78 counts of bank fraud in violation of 18 U.S.C. § 1344, and three counts of a false statement to a bank in violation of 18 U.S.C. § 1005, as the second superseding indictment. In addition, the third superseding information includes a single count of misapplication of bank funds in violation of 18 U.S.C. § 656. Generally, the third superseding information alleges various instances of misconduct by Defendant during his employment with his former employer, Signature

Bank.  The same day that the third superseding information was entered, Defendant entered into a *nolo contendere* plea agreement, pursuant to Federal Rule of Criminal Procedure 11.  Of the 82 counts included in the third superseding information, Defendant plead *nolo contendere* to the added count 82, misapplication of bank funds.

On April 10, 2008, the Court entered an order directing the parties to provide supplemental briefing on a variety of factual and legal issues, developed by the Presentence Report (PSR) issued by the United States Probation Department (Probation), on February 19, 2008 and as amended on March 26, 2008, based upon Defendant's objections to the PSR of March 14, 2008.  In an opinion and order dated May 19, 2008, the Court reached the following conclusions: (1) Defendant's statement to his probation officer contradicting the underlying factual basis provided for his *nolo contendere* plea to count 82 did not affect the validity or enforceability of the plea agreement because Rule 11 does not require a defendant to furnish a factual basis for a *nolo contendere* plea as a condition of the court accepting the agreement; (2) Defendant is not entitled to the two-level reduction for his acceptance of responsibility under U.S.S.G. § 3E1.1 and provided for in the Rule 11 agreement, to the extent that he maintains his innocence for the events related to count 82; (3) Defendant is not subject to the two-level enhancement under U.S.S.G. § 2B1.1(b)(13), because it is conceded that Defendant did not derive any personal financial benefit from his alleged misconduct; and (4) Defendant did not owe any restitution because Signature Bank had no unpaid loss related to the count of Defendant's conviction.

The Court noted that certain factual issues remained, including: (1) the scope of relevant conduct to be considered under U.S.S.G. § 1B1.3, in light of the conclusion that Defendant's misconduct must have been relevant or related to the conduct that was the basis for the conviction;

(2) whether the misconduct constitutes bank fraud against the victim bank, and that the misconduct was material to the bank's loss; (3) the amount of loss to be considered under U.S.S.G. § 2B1.1, in light of the conclusion that only the actual loss is to be considered; and (4) whether Defendant was an employee in a position of trust under U.S.S.G. § 3B1.3, such that he earns two points for abuse of trust. The first three issues are interrelated and will be addressed together. The fourth issue will then be separately addressed.

I

As outlined in the Court order of May 19, 2008, the pertinent elements of bank fraud under 18 U.S.C. § 1344 (counts 1-40, 42-73, 76-81), require proof that the defendant: (1) knowingly; (2) execute or attempt to execute a scheme or artifice; and (3) the scheme or artifice is to defraud a financial institution or to obtain any of the moneys or property of a financial institution by means of false or fraudulent pretenses. *See, e.g.*, *United States v. Ross*, 502 F.3d 521, 530 (6th Cir. 2007) (quoting *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005)).

"[S]pecific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Winkle*, 477 F.3d 407, 413 (6th Cir. 2007) (quoting *United States v. Yoon*, 128 F.3d 515, 523-24 (7th Cir. 1997)). "[T]o have the specific intent required for bank fraud, the defendant need not have put the bank at risk of loss in the usual sense or intended to do so. It is sufficient if the defendant in the course of committing fraud on *someone* causes a federally insured bank to transfer funds under its possession and control." *United States v. Everett*, 270 F.3d 986, 991 (6th Cir. 2001) (reasoning that "causing a bank to transfer funds pursuant to a fraudulent scheme reduces the funds the bank has

-3-

available for its loans and other activities and almost inevitably causes it some loss").

While a defendant's conduct need not actually influence or deceive the bank, the conduct must be "material," meaning that the false statement or conduct at issue has "a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). Importantly, even if bank officials approve of the scheme, a defendant is not relieved of criminal liability, because the victim is the bank as an entity. *Winkle*, 477 F.3d at 414, 414 n.3 (citing *United States v. Abboud*, 438 F.3d 554, 593 (6th Cir. 2006)).

The pertinent elements of making a false statement to a bank under 18 U.S.C. § 1005 (counts 41, 74-75), are as follows: (1) a person who is an agent of a Federal Reserve bank; (2) makes a false entry in a book, report, or statement of the bank; (3) with the intent to injure, defraud, or deceive the bank.[1]  "Guilt under the statute depends upon the existence of an intent to deceive," but "an inference of . . . intent" may arise from "deliberate act[s]." *Crenshaw v. United States*, 116 F.2d 737, 740 (6th Cir. 1940) (internal citation omitted). A false entry "includes any entry on the books of the bank which is intentionally made to represent what is not true or does not exist, with the intent either to deceive its officers or to defraud the association." *United States v. Hardin*, 841 F.2d 694, 698 (6th Cir. 1988) (internal quotation omitted). In contrast, even if a "loan could be characterized as a questionable business transaction, the entry of the note would not be a false entry [if] it recorded an actual transaction exactly as it occurred." *Id.* at 699.

As the Court recognized in its prior order, U.S.S.G. § 1B1.3(a)(2) permits a court to consider,

---

[1] Alternatively, the elements may be: (1) a person who is an agent of a Federal Reserve bank; (2) who lacks authority from the bank to do so; (3) makes, draws, issues, puts forth, or assigns any certificate of deposit, draft, order, bill of exchange, note, debenture, bond, or other obligation, or mortgage, judgment or decree.

as relevant conduct, all acts and omissions "that were part of the same course of conduct or common scheme or plan as the *offense of conviction*." (Emphasis added.) Although so fundamental as to receive little attention in the decisional law, the plain text makes clear that this conduct must pertain to the offense of conviction, itself a violation of law. *See United States v. Cross*, 121 F.3d 234, 238-239 (6th Cir. 1997) (requiring resentencing where illegal conduct, torture, on a different date was unrelated to offense of conviction, drug distribution, and without effect on the offense of conviction). A court has broad discretion in what it considers relevant conduct. In *United States v. Watts*, 519 U.S. 148, 153-154 (1997), the Supreme Court stated that a sentencing court may consider all related conduct, including conduct that did not result in a conviction. *See also United States v. Hough*, 276 F.3d 884, 898 (6th Cir. 2002) ("The court is given wide discretion in what it may consider as relevant in implementing [U.S.S.G. § 1B1.3].").

"Relevant conduct" requires conduct or a scheme or plan similarly oriented toward the same or a like offense, not simply conduct of a like character that has only an attenuated link to illegality. Application Note 9(A) to U.S.S.G. § 1B1.3 defines a "common scheme or plan" as "substantially connected to each other by at least one common factor, such as a common victims, common accomplices, common purpose, or similar *modus operandi*." Application Note 9(B) to U.S.S.G. § 1B1.3 defines the "same course of conduct" as "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *See United States v. Chichy*, 1 F.3d 1502, 1510 (6th Cir. 1993) (affirming a trial court's consideration of fraudulent loans made by a co-defendant, where the loans were part of a common scheme or plan or the same course of conduct). A court should consider the similarity between offenses, the regularity or repetition of offenses, and the time interval between offenses. *Id.*; *see*

-5-

*also United States v. Hill*, 79 F.3d 1477, 1482 (6th Cir. 1991).  Absent one of these factors, a court should look for a greater showing of one of the other factors.  Application Note 9(B) to U.S.S.G. § 1B1.3.

Here, from 2002 to 2005, as one of Signature Bank's principal loan officers, Defendant initiated a number of loans to bank customers.  As asserted in the third superseding information and the PSR, Defendant materially misrepresented the qualifications of a number of borrowers to Signature Bank.  It is also alleged that he made a number of withdrawals from one borrower's credit line and charged the withdrawal to another bank customer.  Most significantly, in a variety of forms, Defendant is alleged to have issued loans or created credit lines for non-existent businesses, for purposes other than stated in the loan application, or to someone other than the listed borrower.

While similarities exist between the conduct of those 81 counts and the conduct in count 82, such as the same injured party, Signature Bank in many instances, similarity alone does not demonstrate a "*course* of conduct" or a "common *scheme or plan*."  To be relevant conduct for a sentencing determination, there must be a connection between that conduct and the offense of conviction.  Thus, the questions to be addressed by the evidence received during the sentencing hearing were as follows:

1.    What was the scheme or artifice employed by Defendant to defraud Signature Bank? With respect to the allegations of making a false statement to a bank, the question is what was the false entry or report Defendant made to Signature Bank?

2.    How was Defendant's fraudulent misconduct material to Signature Bank's business?

3.    What evidence exists, direct or circumstantial, to demonstrate that Defendant engaged in the fraud or scheme with the intent to injure Signature Bank or to deceive its management or

-6-

board of directors?

    4.     What evidence exists that the particular fraudulent misconduct alleged in each count demonstrates a "course of conduct" or "common scheme or plan" with the count of conviction?

II

During the course of the many hearings addressing Defendant's sentencing issues, the government called three witnesses representing Signature Bank's management. Each was questioned concerning the indictment allegations that Defendant employed a "scheme or artifice," intending to deceive the bank's management about material bank business with the intent to harm Signature Bank.

At a hearing on April 21, 2008, the government offered testimony from Richard Carncross, the President and Chief Executive Officer of Huron Corporation, the holding company that owns Signature Bank. Carncross generally testified that lending policies existed at Signature Bank and that he believed that Defendant violated these policies. Carncross did not reference any specific policy or rule, except that Carncross believed that some, if not many, of Defendant's borrowers did not have the ability to repay their loans. Carncross confirmed that Defendant was employed as one of the bank's 25 loan officers, but that he maintained responsibility for about 34% of the bank's loan portfolio. He stated that Defendant was authorized to make secured loans up to $500,000 and unsecured loans up to $50,000.

In addition to the loan officers, Carncross explained that Signature Bank had further layers of lending oversight. Defendant's supervisor, Daniel Cregeur, had initial oversight and he reviewed each of Defendant's loans. Also, a loan review committee, known as the "discount committee" and chaired by Carncross, met every Monday to review a summary of all relevant information about

-7-

each new or renewed loan. This information included the borrower, the amount of the loan and its history if it refinanced an earlier loan, the assigned loan number, the collateral accepted as security for the loan, and the relevant interest rate. According to Carncross, he believed that reports existed for every loan written or rewritten by Defendant and that the discount committee had reviewed each of the transactions at issue in the third superseding information.

Beyond the review of the discount committee, internal examiners and accountants at Plante & Moran also examined loan information at Signature Bank for basic compliance. Carncross stated that those reviews occurred through a sampling of loans, which comprised about 10% of the bank's loans each year. He testified that neither the discount committee, his immediate supervisors, or Plante & Moran identified the loan problems now attributed to Defendant. It was less than clear to the Court how Carncross believed, specifically, that Defendant intentionally violated internal bank procedures or successfully misrepresented information about borrowers that led Signature Bank to make loans that they would not otherwise have made.

The Court conducted subsequent hearings on July 22, September 9, September 25, and November 24, 2008, and June 3, 2009. The witnesses that were called can be loosely grouped into three categories. First, the government called two additional witnesses who were employees of Signature Bank - Daniel Cregeur, the Senior Vice President and Chief Lending Officer, and Tammy DeBoer, a loan collection specialist for the bank. Second, a number of bank customers or people who had interviewed bank customers testified regarding the transactions outlined in the indictment. Finally, Defendant, having originally represented through counsel that he would not testify, decided that he would testify. Defendant testified about the transactions from memory as apparently, he never requested the bank's records or they were not furnished to him.

Daniel Cregeur was Defendant's direct supervisor between 2001 and the date Defendant left his employment at Signature Bank in 2005. Cregeur explained that for the most part, bank management had been pleased with Defendant's performance through 2004. Indeed, Cregeur testified that Defendant, like other bank officers, was reappointed annually by the bank's board of directors. The FDIC report reflects the fact that Signature Bank increased Defendant's compensation in 2002, 2003, and again in 2004. Cregeur explained that throughout that period, Defendant continued to increase his level of lending activity, a criteria that was important to the bank.

Cregeur testified that beginning in late 2004 and early 2005, management began to focus attention on Defendant because of the large number of customers that he served and the size of the loan portfolio for which he was responsible. Cregeur was not clear in identifying who raised the concern or if there was any particular reason for the concern about Defendant. Cregeur did testify at a later point that Alan Heimer was hired as a vice president for Signature Bank in April of 2005 with a purpose to develop independent bank review procedures. Heimer left Signature Bank in 2007.

In any event, Cregeur and Defendant's senior managers sought to have Defendant transfer responsibility for many of his customers and their loans to other loan officers. In a series of memorandums prepared by Cregeur, including memorandums dated January 3, 2005, an undated memorandum, a memorandum dated March 29, 2005, a memorandum dated August 9, 2005, and a mid-year review dated August 26, 2005, Cregeur documented efforts to work with Defendant. The August 26, 2005 review reflects that the loan portfolio that Defendant had been responsible for had been reduced to $42 million by reassigning over 285 customers and almost $11 million in loans.

The January 3, 2005, memorandum from Cregeur to Defendant opens with the following paragraph:

> In September 2004 it was determined that there had to be certain changes made in your loan profile. It was felt that your customer base had increased to a point that was not possible for you or any one lender to effectively. It was further determined that because of this burden, at times, you were not making good credit decisions. These poor decisions have resulted in several large charge offs for the Bank. While your percent of loan losses are well within industry standards, many of your decisions that led to the losses were not.

[Dkt. # 48-2]. In the memorandum, Cregeur requested that Defendant take particular actions to aid in "migrating customers to other lenders." *Id.* Cregeur noted that Defendant's "practice of rewriting and renewing loans without interest being paid current and adequate principal reductions." He further described a particular account on which "over $5,000 in accrued interest from two lines of credit and a note had been rolled into a new note." Cregeur stated: "This is not acceptable and cannot occur again." Cregeur noted that "[c]ertain findings during the credit review were disturbing and indicate a pattern of excessive lending, unsecured credit, debt servicing not being determined, numerous loans over a short period and capitalization of interest." Cregeur further noted that Defendant has "been cooperative in this matter," while noting that Defendant's "actions during this time have sent mixed signals. While you acknowledge management concerns and actions at the same time, you continue to make loan decisions that say otherwise." Cregeur once again referred to the particular incident described above, but only that incident, to support his statements.

The March 29, 2005, memorandum describes certain actions that the Bank expected Defendant to take in order to decrease his lending to agricultural customers, to discontinue his lending to consumer customers, and to provide for more direct review of the bank credits being overseen by Defendant. [Dkt. # 48-3]. Generally, the memorandum includes instructions for Defendant to review and separate customer accounts for bank management. *Id.*

-10-

The August 9, 2005, memorandum stated that since March 29, 2005, Defendant's "lending actions have been closely monitored." [Dkt. # 48-4]. The memorandum noted, but did not describe, several occasions on which Defendant apparently "acted outside the Board Directive" of March 22, 2005. The memorandum indicated that Defendant's "lending authority is immediately reduced to ONLY agriculture customers and their related parties," a change described as "permanent." *Id.* The memorandum indicated that "[e]xceptions can not occur and will result in termination." *Id.*

At hearing, Cregeur testified as to a number of the bank's internal practices as they were relevant to Defendant's alleged bank fraud. For example, up until 2005, individual bank lenders had the authority to make decisions about the loans that they would make, the ability and obligation to prepare all of the loan documentation for the loans, and the ability to close the loan without the involvement of other employees subject to the review process described by Carncross. Cregeur also explained that at some point, the bank developed a collections department that was used primarily for consumer loans. In contrast to consumer loans, commercial loan officers generally maintained responsibility for collection of the loans they had made to bank customers. Cregeur explained that Defendant, in particular, sought to collect the loans he had made primarily because he believed that he could be more effective than the collections employees in doing so because of his knowledge and historical relationship with the bank customer. The bank converted much of their loan operations to a new computer in August 2005, which significantly changed the manner that the bookkeeping was maintained for loans. Generally speaking, prior to that time, the historical business justification or purpose for the loan was to be maintained in the bookkeeping for the loan when the loan was refinanced.

It was also an accepted historical practice at Signature Bank that loan papers that did not

require a notary public could be taken outside the bank by bank customers to obtain relevant signatures; lenders were not required to actually observe the borrowers' signatures. While the rule did change, it was not clear when that occurred. Capitalizing interest from prior loans was also a practice at Signature Bank. Cregeur testified that Defendant was criticized during the period of his investigation, because in his opinion, Defendant was doing so excessively. Cregeur did not identify any particular criteria for his opinion that Defendant was excessively recapitalizing interest in later loans. Cregeur also acknowledged that Defendant developed unique expertise in working with troubled loans, including bankruptcy. He became an internal specialist in dealing with those types of problems and, as a result, ended up with a number of troubled bank loans in his portfolio. Indeed, progress in transferring loan customers to new lenders from Defendant was in part attributable to the fact that many customers wanted to maintain their relationship with Defendant.

Cregeur also acknowledged that Defendant's loan loss over the years was "modest by comparison" to other lenders. The loss was at least partly attributable to the fact that he had a lot of "bankrupts and problem people." Cregeur also believed that Defendant renewed many of these problem loans rather than begin collection because he legitimately believed that the borrowers could work their way out of the problems.

Importantly, Cregeur testified that he did not believe that Defendant ever engaged in any behavior or practice with the intention of harming Signature Bank. Tammy DeBoer, Signature Bank's collection specialist, acknowledged a difference of opinion with Defendant about their respective approaches to loan enforcement. Indeed, she explained that shortly after Defendant left Signature Bank, she thought he may have intended to harm Signature Bank. She testified that since that period of time she had changed her opinion. She no longer believed that was his intent. She

explained that she reached that opinion based on her later observance of Defendant's practices at Northstar Bank and his relationships with his customers and his confidence in their ability to repay the loans.

As the Court explained in its prior order, there is a significant factual dispute between Defendant and his former employer, the bank.  Defendant presents himself as a loyal employee for twenty-six years who accepted the unusual responsibility for maintaining an enormous loan portfolio for the bank, in part because of the bank's encouragement of the practice.  He acknowledges most of the events referred to in the third superseding information, but he seeks to explain each as assignable to an unintentional error, as loans made and documented consistent with bank procedures at the time or otherwise made with the involvement of other bank officials.  He also emphasizes that his superiors at the bank were not deceived by any of his practices and that they reviewed most, if not all, of the loans he initiated.  Indeed, he emphasizes that those same persons had no less responsibility than Defendant for quality assurance and compliance and that he complied with management's direction in performing his work.

Before addressing the specific evidence entertained during the hearing, attention should be given to a significant contextual point developed by Defendant in his sentencing memorandum [Dkt. # 37] and later in his testimony.  When Defendant left the employ of Signature Bank in September 2005, he went to work for Northstar Bank.  Defendant explains and the evidence suggests that he worked many hours a week and was responsible for between 800 and 1000 bank customers during his tenure at Signature Bank.  Northstar Bank, apparently, was organized in 2001 as a competitor to Signature Bank.  Indeed, Defendant contended in his answer to motion to quash subpoena and for protective order [Dkt. # 3], that as Northstar was developing its business that "President Richard

-13-

Carncross was so irritated by the presence of this new bank that he told the principals of Northstar Bank who had collectively $9 million of loans in Signature Bank" to get their loans out of the bank. Also, some "eleven or twelve employees of Signature Bank became employees of North Star Bank much to the unhappiness of Mr. Carncross and presumably the Board of Directors." Collection specialist DeBoer could identify at least ten employees who left Signature Bank to accept employment at Northstar Bank.

Accordingly, Defendant contends that Signature Bank's efforts to reduce his loan portfolio arose in response to Signature Bank's concern that he, like other employees, might leave their employment and begin work for Northstar together with his loyal customer base. Defendant also explains Signature Bank's report to the FDIC as retaliation for his leaving Signature Bank and beginning work for Northstar. Little attention was given to the arguments during the hearing, as it was conceded that Signature Bank's motives in reporting Defendant's alleged activities to the FDIC were and are irrelevant to the question of Defendant's misconduct. On the other hand, the accusations are relevant to evaluating the source and character of information furnished to the FDIC and the government about Defendant's conduct. Indeed, as Defendant emphasizes, when Signature Bank filed its civil suit, it sought, remarkably, compensation from Defendant for ". . . causing certain customers of [Signature Bank] to terminate their business relationship with [Signature Bank] and for a new relationship with Northstar Bank . . . ." Compl. ¶ 46. In the litigation, Signature Bank responded to an interrogatory explaining that it was believed that Defendant was financially responsible to Signature Bank for "Loans Paid Off and Moved to Northstar" of $11,932,202.30, as well as "Deposits Lost to Northstar Due to Loans Moving" of $459,039.43.

Defendant also emphasizes that the result of the FDIC investigation was his termination of

employment by Northstar Bank, which effectively resolved Signature Bank's concern about legitimate competition from Northstar Bank with Defendant's assistance. The FDIC reported dated May 30, 2006, did recommend that FDIC "pursue removal action pursuant to Section 8(e) of the FDI Act against Kenneth Yaroch." The report is based primarily upon a review of the documents furnished by Signature Bank, the bank officers' explanations about what they believe occurred, and memoranda prepared by Cregeur or Signature Bank Vice President Heimer summarizing interviews with a number of the bank customers that were performed after Defendant left employment with Signature Bank.

Resolution of Defendant's sentence necessitates a particularized understanding of the events outlined in the third superseding information. What follows below is a chart listing the bank loan that provided the predicate for each of the counts against Defendant. The first five columns are drawn from the PSR and the concluding three columns are drawn from government exhibit 102. The chart also provides the date of each loan, the amount for each loan, the type of loan, and the applicant for the loan. It should be noted that in the earlier opinion, it was concluded based on Application Note 3(A)(i) to U.S.S.G. § 2B1.1, only the actual loss to Signature Bank, or $690,967.76 is to be considered for purposes of the guideline.

| Count | Date | Amount | Type of Loan | Applicant | Principal Amount Charged Off | Recovery | Balance as of July 14, 2008 |
|-------|------|--------|--------------|-----------|------------------------------|----------|------------------------------|
| 1 | 5/5/05 | $6,000.00 | Line of Credit | Scotty Scott | $6,000.00 | N/A | $6,000.00 |
| 2 | 5/31/05 | $3,200.00 | Line of Credit | Scotty Scott | $3,200.00 | N/A | $3,200.00 |
| 3 | 7/29/05 | $4,500.00 | Line of Credit | Diane Spencer, Clinton Spencer (see also count 82) | $4,500.00 | N/A | $4,500.00 |

-15-

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Counts 1-3 Total | | **$9,200.00** | | | | | |
| 4 | 3/21/02 | $19,219.51 | Business | Charles Dufty | N/A | N/A | N/A |
| 5 | 1/24/03 | $15,699.34 | Business | Charles Dufty | N/A | N/A | N/A |
| 6 | 3/7/03 | $18,607.12 | Business | Charles Dufty | N/A | N/A | N/A |
| 7 | 12/19/03 | $16,490.42 | Business | Charles Dufty | N/A | N/A | N/A |
| 8 | 3/19/04 | $18,524.77 | Business | Charles Dufty | N/A | N/A | N/A |
| 9 | 12/17/04 | $16,863.30 | Business | Charles Dufty | $16.258.74 | $8960.00 | $8208.74 |
| 10 | 4/29/05 | $24,510.39 | Business | Charles Dufty | $24,475.74 | $106.26 | $24,369.48 |
| Counts 4-10 Total | | **$129,914.85** | | | | | |
| 11 | 2/13/04 | $45,000.00 | Business | Michael Parks, Cheyann Parks | N/A | N/A | N/A |
| 12 | 3/24/05 | $45,000.00 | Business | Michael Parks, Cheyann Parks | $44,920.25 | $1800.00 | $43,190.25 |
| 13 | 5/20/05 | $32,485.00 | Business | Michael Parks, Cheyann Parks | $32,485.00 | $3,448.20 | $29,036.80 |
| 14 | 9/16/05 | $19,565.48 | Business | Cheyann Parks | $19,565.48 | $2,020.05 | $17,545.43 |
| Counts 11-14 Total | | **$142,050.48** | | | | | |
| 15 | 4/11/03 | $56,310.44 | Business | William Hagan | $51,140.49 | N/A | $51,140.49 |
| 16 | 1/7/05 | $20,000.00 | Business | William Hagan | $14,109.62 | N/A | $14,109.62 |
| 17 | 6/29/05 | $26,080.50 | Business | William Hagan | $13,705.50 | N/A | $13,705.50 |
| 18 | 8/22/05 | $2,585.00 | Business | William Hagan | N/A | N/A | N/A |
| Counts 15-18 Total | | **$104,975.94** | | | | | |
| 19 | 4/26/01 | $1,550.00 | Consumer | Leonard Garza | N/A | N/A | N/A |
| 20 | 7/3/01 | $1,050.00 | Consumer | Leonard Garza | N/A | N/A | N/A |
| 21 | 8/30/01 | $3,250.00 | Consumer | Leonard Garza | N/A | N/A | N/A |
| 22 | 11/2/01 | $755.00 | Consumer | Leonard Garza | N/A | N/A | N/A |
| 23 | 1/30/02 | $10,110.00 | Consumer | Leonard Garza | N/A | N/A | N/A |
| 24 | 7/3/02 | $10,110.59 | Consumer | Leonard Garza | N/A | N/A | N/A |
| 25 | 11/27/02 | $4,689.53 | Consumer | Leonard Garza | N/A | N/A | N/A |
| 26 | 12/6/02 | $10,486.33 | Consumer | Leonard Garza | N/A | N/A | N/A |
| 27 | 1/23/03 | $875.00 | Consumer | Leonard Garza | N/A | N/A | N/A |
| 28 | 6/18/03 | $10,687.10 | Business | Leonard Garza | N/A | N/A | N/A |
| 29 | 10/6/03 | $6,287.30 | Business | Leonard Garza | N/A | N/A | N/A |

-16-

| 30 | 11/14/03 | $875.00 | Business | Leonard Garza | N/A | N/A | N/A |
| 31 | 11/25/03 | $575.00 | Consumer | Leonard Garza | N/A | N/A | N/A |
| 32 | 2/9/04 | $10,671.87 | Consumer | Leonard Garza | $8,022.80 | N/A | $8,022.80 |
| 33 | 3/22/04 | $575.00 | Consumer | Leonard Garza | N/A | N/A | N/A |
| 34 | 9/8/04 | $1,316.82 | Consumer | Leonard Garza | N/A | N/A | N/A |
| 35 | 11/8/04 | $2,138.53 | Consumer | Leonard Garza | N/A | N/A | N/A |
| 36 | 3/21/05 | $2,704.34 | Consumer | Leonard Garza | $1,710.99 | N/A | $1,710.99 |
| 37 | 7/6/05 | $8,994.66 | Business | Leonard Garza | $8,633.62 | N/A | $8,633.62 |
| Counts 19-37 Total | | **$87,702.07** | | | | | |
| 38 | 2/27/03 | $2,450.00 | Business | Ronald Haag, Jr. | N/A | N/A | N/A |
| 39 | 4/28/03 | $10,075.00 | Business | Ronald Haag, Jr. | N/A | N/A | N/A |
| 40 | 12/14/04 | $54,535.94 | Business | Ronald Haag, Jr. | $44,128.34 | $16.70 | $44,111.64 |
| Counts 38-40 Total | | **$67,060.94** | | | | | |
| 41 | 1/1/05 - 8/5/05 | $8,000.00 | Mortgage/ Consumer (Tax Return) | Frederick Krueger | N/A | N/A | N/A |
| Count 41 Total | | **$8,000.00** | | | | | |
| 42 | 2/26/04 | $56,900.00 | Mortgage | Michael Jackson, Casey Jackson | N/A | N/A | N/A |
| 43 | 2/25/05 | $25,000.00 | Business Line of Credit | Michael Jackson, Casey Jackson | N/A | N/A | N/A |
| Counts 42-43 Total | | **$81,900.00** | | | | | |
| 44 | 12/18/02 | $28,789.92 | Business | James Hollinshead, Shannon Hollinshead | N/A | N/A | N/A |
| 45 | 5/27/03 | $52,404.91 | Business | James Hollinshead, Shannon Hollinshead | N/A | N/A | N/A |
| 46 | 7/14/04 | $56,647.37 | Business | James Hollinshead, Shannon Hollinshead | N/A | N/A | N/A |

| 47 | 6/29/05 | $25,085.00 | Business | James Hollinshead, Shannon Hollinshead | $16,342.71 | $3,400.00 | $12,942.71 |
|---|---|---|---|---|---|---|---|
| 48 | 9/14/05 | $51,893.57 | Business | James Hollinshead, Shannon Hollinshead | $51,877.06 | N/A | $51,877.06 |
| Counts 44-48 Total | | **$214,820.77** | | | | | |
| 49 | 11/15/04 | $15,075.00 | Business | Kimberly Harding | $15,075.00 | N/A | $15,075.00 |
| 50 | 12/27/04 | $7,075.00 | Business | Kimberly Harding | $7,075.00 | N/A | $7,075.00 |
| 51 | 4/29/05 | $11,085.00 | Consumer | Kimberly Harding | $11,085.00 | N/A | $11,085.00 |
| 52 | 8/26/05 | $11,085.00 | Consumer | Kimberly Harding | N/A | N/A | N/A |
| Counts 49-52 Total | | **$44,320.00** | | | | | |
| 53 | 10/15/02 | $77,235.52 | Business | Keith Peters, Shirley Peters | N/A | N/A | N/A |
| 54 | 4/21/03 | $59,977.90 | Business Renewal | Keith Peters, Shirley Peters | N/A | N/A | N/A |
| 55 | 10/31/03 | $59,977.90 | Business Renewal | Keith Peters, Shirley Peters | N/A | N/A | N/A |
| 56 | 6/30/04 | $59,977.90 | Business Renewal | Keith Peters, Shirley Peters | N/A | N/A | N/A |
| 57 | 11/4/02 | $6,065.00 | Business | Keith Peters, Shirley Peters | N/A | N/A | N/A |
| 58 | 2/3/03 | $6,065.00 | Business Renewal | Keith Peters, Shirley Peters | N/A | N/A | N/A |
| 59 | 5/27/03 | $6,065.00 | Business Renewal | Keith Peters, Shirley Peters | N/A | N/A | N/A |
| 60 | 4/21/03 | $40,075.00 | Business | Keith Peters, Shirley Peters | N/A | N/A | N/A |
| 61 | 6/9/03 | $10,075.00 | Business | Keith Peters, Shirley Peters | N/A | N/A | N/A |
| 62 | 10/31/03 | $105,651.72 | Business | Keith Peters, Shirley Peters | N/A | N/A | N/A |
| 63 | 6/30/04 | $103,023.68 | Business Renewal | Keith Peters, Shirley Peters | N/A | N/A | N/A |
| 64 | 1/19/04 | $15,075.00 | Business | Keith Peters | N/A | N/A | N/A |

| 65 | 2/25/04 | $15,075.00 | Business | Keith Peters | N/A | N/A | N/A |
| 66 | 6/30/04 | $8,075.00 | Business | Keith Peters | N/A | N/A | N/A |
| 67 | 6/19/04 | $18,075.00 | Business | Keith Peters | N/A | N/A | N/A |
| 68 | 8/31/04 | $60,075.00 | Business | Keith Peters | $60,075.00 | N/A | $60,075.00 |
| 69 | 9/30/04 | $15,075.00 | Business | Keith Peters | $15,075.00 | N/A | $15,075.00 |
| 70 | 10/25/04 | $110,075.00 | Business | Keith Peters | $110,075.00 | N/A | $110,075.00 |
| 71 | 10/25/04 | $100,075.00 | Business | Keith Peters | $100,075.00 | $1,200.00 | $98,875.00 |
| 72 | 12/24/04 | $12,075.00 | Business | Keith Peters | $12,075.00 | $1,082.37 | $11,242.63 |
| 73 | 2/28/05 | $20,085.00 | Business | Keith Peters | $20,085.00 | N/A | $20,085.00 |
| 74 | 2/8/04 | $20,000.00 | Business, Personal, Mortgage, and Lines of Credit | Keith Peters, Shirley Peters | N/A | N/A | N/A |
| 75 | 2/28/05 | $0.00 | Business, Personal, Mortgage, and Lines of Credit | Keith Peters | N/A | N/A | N/A |
| Counts 53-75 Total | | **$927,949.62** | | | | | |
| 76 | 10/7/05 | $19,165.00 | Business | Diane Spencer | | | |
| 77 | 11/16/05 | $16,650.00 | Business | Diane Spencer | | | |
| 78 | 9/8/06 | $5,800.00 | Business | Diane Spencer | | | |
| 79 | 11/16/06 | $36,818.00 | Business | Diane Spencer | | | |
| 80 | 2/28/07 | $8,572.26 | Business | Diane Spencer | | | |
| Counts 76-80 Total | | **$87,005.26** | | | | | |
| 81 | 12/30/05 | $22,165.00 | Business | Casey Jackson | | | |
| Count 81 Total | | **$22,165.00** | | | | | |
| 82 | 7/29/05 | $4,500.00 | Line of Credit | Keith Peters | | | |
| Count 82 Total | | **$4,500.00** | | | | | |
| TOTAL | | $1,931,564.93 | TOTAL OUTSTANDING BALANCE $690,967.76 | | | | |

II

A

Defendant attached three affidavits from bank customers involved in transactions identified in the third superseding information to his amended sentencing brief and reply to government response to order directing briefing of sentencing issues [Dkt. # 39], filed on May 5, 2008. The three bank customers who provided affidavits, Cheyann Parks, Casey Jackson, and Shannon Hollinshead, are daughters of bank customer Diane Spencer. Each individual had been interviewed earlier by a bank officer or FDIC representative after Defendant left his employment with the bank. Casey Jackson also testified at Defendant's sentencing hearings. The affidavits and testimony describe the transactions that are addressed in certain counts of the third superseding information. A government agent testified after reviewing the affidavits and hearing the testimony, that they furnished decidedly different information from that originally furnished to the government. The Court will address the counts implicated by these three affidavits first. They are counts 11 through 14, 42, 43, 81, and 44 through 48.

Counts 11-14

The first affidavit is from Cheyann Parks, and describes several of her and her husband's transactions with Defendant, which are implicated by counts 11 through 14. [Dkt. # 39-2]. According to the PSR (¶¶ 36-39), counts 11, 12, and 13 involved Defendant completing fraudulent loan applications for Cheyann Parks and her husband, Michael Parks, which they signed. The applications reflected that the couple was involved in a farming business, that the loans' purpose was the production of cattle, that the source of repayment of the loans would be the sale of cattle, and that the security for the loan would be cattle and machinery. A note, presumably Defendant's,

-20-

appeared in the paperwork stating, "Purchase cattle and feed–Cheyann Parks, Michael Parks is truck driver and makes $40,000 year."

According to the PSR, at the time that Defendant processed the loans, the couple did not have a farm or any cattle or equipment, and the loan was for the purpose of making home repairs and for opening an adult foster care home that was to be run by Cheyann Parks' parents. In an interview with Cregeur and relied upon by the FDIC, Cheyann Parks advised that she was not aware that the loan documentation indicated she owned cattle, as she trusted Defendant to complete the paperwork with the correct information. She stated that she had previously received loans from the bank that Defendant had prepared, without having read the documents.

According to the PSR, count 14 was a business loan granted to Cheyann Parks in her name alone. The documented purpose of the loan was for feed and calves. The application did not refer to the type of business in which Cheyann Parks was involved or the security that would be made available for the loan. However, the promissory note stated the loan was secured by a security agreement dated November 20, 2003. That security agreement stated that the Parks' business was farming and that "all cattle now owed and hereafter acquired" would serve as collateral for the debts owned by the bank. Identical to counts 11-13, the couple were not involved with any type of farming or cattle operation and the purpose of the loan was to make home repairs and open an adult foster care home.

Defendant testified that counts 11 and 12 relate to a loan the original purpose for which was for farming and to purchase feeder cattle. The count 13 loan was for house repairs, cattle, and equipment. The count 14 loan was a personal loan to Cheyann Parks for calves and feed. According to Defendant, Cheyann Parks's parents, Diane and Clinton Spencer, had sought bankruptcy

-21-

protection as dairy farmers. The loans represented by counts 11 through 14 were refinanced loans that enabled the purchase of an adult foster care home run by the Parks and the Spencers. Signature Bank was paid in full, with the exception of a discount that the bank, not Defendant, decided to give the individuals.

In her affidavit Cheyann Parks confirms that she is the daughter of Diana Spencer and that she "was involved in assisting her parents through their financial difficulties by acquiring, along with my husband [Michael Parks], a small farm formally owned and occupied by [another couple]." Cheyann Parks states that on or about February 13, 2004, the house and the buildings and 22 acres were acquired with a mortgage for $135,000 with a line of credit of $45,000 "to be used to purchase cattle to feed out and also to help with upgrading the house to meet the standards for an adult foster care home." The original $45,000 line of credit appears to be reflected in count 11.

Cheyann Parks states that on or about March 24, 2005, the line of credit was renewed and was for the original stated purpose. This renewal appears to be reflected in count 12.

Cheyann Parks states that on or about May 20, 2005, a $32,485.00 loan was received "to consolidate prior debts that had occurred during the past year in remodeling the house, purchasing equipment and furniture for the house and for the possible purchase of some calves to be raised." She further indicates that "[t]he repayment of this loan was set up on an annual payment so that cattle could be raised and paid for from the profits of the sale of cattle." This loan appears to be reflected in count 13.

Cheyann Parks further provides that on September 16, 2005, she borrowed $19,565.48 and that it is her "recollection that [she] borrowed the money for assisting [her] parents in the farm operating." She indicates that the loan was a "renewal of previous loans that [she] borrowed to help

[her] parents and they were going to help pay this loan from the sale of cattle." She indicates that part of the loan is from several years prior, when she worked on the farm with her parents. This loan appears to be reflected by count 14. Finally, Cheyann Parks states that the adult foster care home has been certified and was appraised at $271,500.00 on March 4, 2006. She states that "we owed approximately $220,000 to Signature Bank . . . but Signature Bank, in order to be rid of us, settled for the sum of $150,000.00."

The papers and testimony provided to the Court do not support a finding that Defendant engaged in any fraud as to counts 11 to 14. Cheyann Parks's affidavit supports Defendant's testimony that the family was in the agricultural business during the relevant period of time. The evidence also supports that each loan was either used for the purposes specified or was a consolidation loan on which Defendant carried forward the purpose of the original loan pursuant to the bank's policies. Moreover, even if the bookkeeping for the loan's purpose was erroneous, the evidence, at most, shows a lack of due diligence by Defendant, and not a scheme or artifice employed by Defendant to defraud or deceive the bank. Also, none of the management representatives testified about how or why Defendant's bookkeeping or reporting of the loans were material to management's decisions. Finally, apart from the fact that Signature Bank was alleged a common victim, there is no basis in the evidence to find the allegations related to the Parks and the Spencers are part of the same course of conduct or common scheme or plan as count 82. Thus, the conduct alleged in counts 11 through 14 is also not relevant conduct.

<u>Counts 42-43, 81</u>

Defendant's transactions with Casey Jackson are implicated in counts 42, 43, and 81 [Dkt. # 39-2]. According to the PSR, count 42 involved a mortgage loan in the amount of $56,900 to

Casey Jackson and her husband, Michael. Apparently, a mortgage loan application completed by Defendant but signed by the Jacksons stated that they owned $15,000 worth of cattle. The application also noted $2,400 of gross monthly income for Michael Jackson and $1,200 of monthly income for Casey Jackson.

According to the PSR, count 43 involved a business line of credit in the amount of $25,000 to the Jacksons. The stated purposes for the loan was for repairs to a foster care home and cattle for a farm business. The application stated that the source of funds to be used for repayment of the loan would be profits and that the security for the loan was land on the real estate mortgage. A note on the application states, "[Michael Jackson] works as carpenter--runs cattle on side."

According to the PSR, the Jacksons did not own any cattle or have a farming operation. According to an unidentified investigator, the Jacksons were not aware the loan application stated they had owned cattle. Michael Jackson told investigators that Defendant had been to their home and should have been aware of the fact that they did not have a farming operation.

According to Defendant, Casey Jackson was involved with a $23,000 cattle note with her parents, the Spencers, who were involved in dairy farming and filed bankruptcy. Further, the Jacksons, along with the Parks, assisted the Spencers in obtaining a foster care home and they intended to raise cattle on the side. Defendant indicated that he had never been to the Jacksons' home. Finally, Defendant described the situation as a "work out scenario" and noted that the loans involved in counts 42 and 43 had been paid in full.

According to Casey Jackson's affidavit, the note dated February 26, 2004, implicated by count 42, for $56,900.00, involved the purchase of a previously licensed foster care home. She states that she "had borrowed money to assist [her] parents in their dairy operation and it was [her]

-24-

understanding that [her] parents, Clinton and Diana Spencer, were giving [her] $15,000 worth of cattle as a result of [her] assistance to them."

Casey Jackson further states that the note dated February 25, 2005, implicated by count 43, for $25,000.00 "was used for the improvements of the house in order to meet the standards to operate an adult foster care." She elaborates that "[a]t the time of getting the line of credit it was discussed that if there was any money left over we would raise cattle at Clinton and Diana Spencer's farm. There was not money left over so we did not, in fact, purchase cattle."

According to the PSR, count 81 involved a business loan from Northstar Bank to Casey Jackson. The PSR alleges that the representation on the loan application concerning farming was false. The Jacksons stated to an investigator that they had never operated a farm. They stated that for approximately six months during 2002 or 2003, they had raised approximately 13 calves for fun and not for profit. They stated that they did not own or rent any equipment and had never requested a loan for purchasing these cattle. Casey Jackson stated that you often "just put down whatever" on loan applications to ensure that they were processed. She further stated that without Defendant making notations on their files, that she and her husband would not have otherwise qualified for the loans based on their income. The Jacksons further stated they were unaware the loan documents had represented they had a farming operation and were raising cattle.

According to the PSR, when Defendant left Signature Bank, a new loan officer came to the Jacksons' home and asked to see the cattle operation. Casey Jackson advised the loan officer there was no such operation. At this time, Casey Jackson owed Signature Bank approximately $128,000 to $138,000. The new loan officer asked if they wanted to refinance their mortgage loan to pay off their debt. The Jacksons eventually obtained a loan through Defendant at Northstar Bank to

-25-

refinance the mortgage to pay off the debt at Signature Bank. According to an unidentified investigator, Northstar Bank suffered no losses in regard to these matters.

According to Defendant, the loan applications reflected what he was told by the Jacksons. He states that he was aware that the Jacksons were assisting Casey Jackson's sisters and her mother, Diane Spencer. Defendant states that it was his knowledge that they were all in one manner or another involved with raising heifers or steers. Defendant further states that the count 81 loan has been paid in full and that to the best of his knowledge the Jacksons are amortizing a mortgage with regular payments at Northstar Bank.

Casey Jackson's affidavit states that the note dated December 30, 2005, implicated by count 81, for $22,165.00, was a loan to pay off a cattle loan note at Signature Bank. She states that the cattle loan had been taken out to assist her parents in their dairy farm operation. She states that Russ Tibbits at Signature Bank wanted her to pay off the cattle loan note before processing a mortgage loan. She discussed the issue with Defendant, at Northstar Bank, along with other outstanding bills that had occurred in relation to the remodeling of the foster care home and medical bills from her son. Subsequently she received a letter from the State of Michigan, presumably a Uniform Commercial Code filing, indicating that NorthStar Bank had taken a blanket lien on all assets, including cattle. She called Defendant, who offered to have her "resign the documents as apparently he had the original application saying that the loan was paying off a cattle loan. Since the paper work was already started on the mortgage we decided to leave the Note as it was until the Mortgage paper work was done and transfer this loan to the adult foster care business."

The papers and testimony provided to the Court do not support a finding that Defendant engaged in any fraud as to counts 42, 43, or 81. Casey Jackson's affidavit corroborates Defendant's

-26-

testimony that the family was in the agricultural business and that the loans were used for cattle and the foster home. There was no testimony explaining why Defendant's bookkeeping for the loan papers violated internal practices or was material to the bank's decisionmaking. Moreover, even if the evidence did not support that the loans stated the correct purpose, the evidence, at most, shows a lack of due diligence by Defendant, and not an intent to defraud or deceive. The evidence presented does not establish a scheme or artifice employed by Defendant to defraud or deceive the bank, that Defendant's conduct was material to the bank's business, or that Defendant had the intent to defraud or deceive the bank. Finally, apart from the fact that Signature Bank was alleged a common victim, there is no basis in the evidence to find the allegations related to the Jacksons are part of the same course of conduct or common scheme or plan as count 82. Thus, the conduct alleged in counts 42, 43, and 81 is not relevant conduct.

<u>Counts 44-48</u>

Defendant's transactions with Shannon Hollinshead are implicated in counts 44-48 [Dkt. # 39-2]. According to the PSR, counts 44 through 48 involve business loans issued in the names of James and Shannon Hollinshead. With respect to the loan implicated by count 44, Defendant completed the loan application, and the Hollinsheads signed the application without reading it. The stated business purpose for the loan was farming, the source of funds to be used for repayment of the loan was said to be "put back on payment in May," and the security available to the bank for the loan was apparently cattle. Yet, the Hollinsheads were not involved in farming or planning to become involved in one at the time they submitted the loan applications.

According to the PSR, the stated purpose for the loan implicated by count 45 was for debt consolidation, the stated purpose of the loan implicated by count 46 was financing cattle, the stated

purpose of the loan implicated by count 47 was the financing of the purchase of a vehicle and equipment, and the stated purpose of the loan implicated by count 48 was the renewal of a previous loan. According to the PSR, and as previously stated, the Hollinsheads were not involved in any type of farming business, did not own any cattle, and were not in the process of purchasing any cattle.

Apparently, Shannon Hollinshead told unidentified investigators that she had a calf operation in 1998 or 1999, but that she had lost all of her cattle to disease. She stated that she did not believe that Defendant had been aware of this previous operation and she did not recall securing any loan for this purpose in either 1998 or 1999. She also did not recall discussing the operation with Defendant. Shannon Hollinshead worked at a nursing home and her husband was disabled and unemployed. According to Shannon Hollinshead, Defendant knew about their employment status as they had discussed it with him. The loans the Hollinsheads applied for were for personal expenses, not business purposes, of which they informed Defendant.

According to Defendant, the Hollinshead loans originated in the 1990s for cattle and dairy operation purposes. For awhile they were not raising cattle, but they were always planning to, thus, per the bank procedures, the loans were identified internally as farming loans. According to Defendant, the loans represented by counts 44, 45, and 46 were consolidated into the loans represented by counts 47 and 48. The loans were current when Defendant left Signature Bank. Defendant also stated that the Hollinshead loans are related to their activities with Shannon Hollinshead's parents and involved work outs.

In her affidavit, Shannon Hollinshead states that it is her recollection that the December 18, 2002, loan, implicated by count 44, for $28,789.92 was for farming when her family, including her

mother, Diana Spencer, owned and milked cows. Shannon Hollinshead's affidavit further states that it is her recollection that the loan dated May 27, 2003, for $52,404.91, implicated by count 45, was a consolidation of "all of our notes into one pay out note." She states that "[a]t that time my husband, James, wanted to continue to raise cattle and he still does to this very day. We had just gotten out of milking cows and discussed operating a cow/calf operation or just raising calves so as to make an annual payment."

Shannon Hollinshead further states that the loan dated July 14, 2004, implicated by count 46 (the actual date is November 14, 2004), for $56,647.37, was a rewrite of the count 45 loan and "possibly a consolidation of another loan." At that time the monthly payment was increased from $300 to $350. Shannon Hollinshead indicates that she and her husband intended to raise cattle, but his need for a new kidney and being sick for one year had put their plan behind.

Shannon Hollinshead further states that the loan dated June 29, 2005, implicated by count 47, for $25,085.00, was a consolidation of several loans, and required a monthly payment of $500. She also states that the loan dated September 14, 2005, implicated by count 48 (the actual date is November 14, 2005), for $51,893.57, represented their remaining debt and was a renewal of the count 46 loan, and required an annual payment. She further states that she and her husband intended to get cattle and raise them, but due to a complicated pregnancy, "we did not get our plan of raising cattle together."

The papers and testimony provided to the Court do not support a finding that Defendant engaged in any fraud as to counts 44 through 48. Shannon Hollinshead's affidavit and testimony support Defendant's testimony that the family was in the agricultural business during the relevant period of time. The evidence also supports that each loan was either used for the purposes specified

-29-

or was a consolidation loan on which Defendant carried forward the purpose of the original loan pursuant to the bank's policies. Again, even if the evidence did not support that the loans stated the correct purpose, the evidence, at most, shows a lack of due diligence or mischaracterization of the collateral by Defendant, and not an intent to defraud or deceive. In sum, the evidence presented does not establish a scheme or artifice employed by Defendant to defraud or deceive the bank, that Defendant's conduct was material to the bank's business, or that Defendant had the intent to defraud or deceive the bank. Finally, apart from the fact that Signature Bank was alleged a common victim, there is no basis in the evidence to find the allegations related to Shannon Hollinshead are part of the same course of conduct or common scheme or plan as count 82. Thus, the conduct alleged in counts 44 through 48 is not relevant conduct.

B

The Court will now turn to the remaining counts.

Counts 1 through 3

According to the PSR, counts 1 and 2 allege that on May 5, 2005, and May 31, 2005, Defendant approved and executed draws of $6,000 and $3,200, respectively, on the account of Scotty Scott's commercial line of credit. In both instances, the funds were deposited into Keith Peters's account at the bank. This draw was done without the knowledge or approval of Scott. According to investigators, Scott did not know of Peters. The Suspicious Activity Report prepared by the bank in relation to these transactions note, "The account numbers are too unique to accept it as a mistake." (PSR ¶¶ 27-28.)

Similar to counts 1 and 2, count 3 alleges that on July 29, 2005, Defendant executed a draw of $4,500 on the commercial line of credit account of the Spencers and then deposited the funds into

Peters' account at the bank.  The draw was accomplished without the knowledge or approval of either of the Spencers.  (PSR ¶ 29.)

According to Defendant, the draws on Scott's line of credit with deposits into Peters' account were mistakes.  He explained that at any given time, he might have ten to fifteen line of credit draw requests on his desk.  He also explained that other such mistakes did occur but ordinarily would have been caught by bookkeeping and he does not know why that did occur in this instance.  Defendant testified that both Scott and Peters were "high-maintenance" clients, meaning that they had a lot of transactions.  He explained, for example, that he would regularly have Peters' account information on his desk because of his high incidence of overdrafting his account and Defendant's practice of reversing charges so that he could pay his loans, a practice that was not unusual apparently.

While the government suggested that Peters had difficulty repaying his debt, Defendant indicated that he also had the authority to overdraw Peters' line of credit, thus, there was no reason to involve Scott with Peters or the Spencers.  When bank officials notified Defendant of these mistakes in January 2006, Defendant claims that he offered to go see Peters to resolve the matter, the bank told him not to do so.  The bank subsequently reversed the mistakes as to Scott and the Spencers, with the obligation falling entirely on Peters.

The papers and testimony provided to the Court do not support a finding that Defendant engaged in any fraud as to counts 1 through 3.  There was nothing about the way the transactions were implemented that in any way would have suggested that the transactions, erroneous though they might be, were hidden from anyone, including Scott, the Spencers, or the bank.  Nor did any of the bank witnesses offer any suggestion about why the transactions may have been needed to benefit Peters at the time.  In sum, the evidence presented does not establish a scheme or artifice

employed by Defendant to defraud or deceive the bank, or that Defendant had the intent to defraud or deceive the bank. Indeed, Signature Bank would not be the "victim." Thus, the conduct alleged in counts 1 through 3 is not relevant conduct.

Counts 4 through 10

According to the PSR, counts 4 through 10 involved Defendant processing and approving business loans to Charles Dufty. In each of the instances, Defendant completed a loan application from the information furnished by Dufty, and Dufty subsequently signed the document. According to the applications, Dufty was involved in the construction trade, and the purpose of the loans was to finance the purchase of equipment. The security made available to the bank for the loan was the equipment he purchased with the loan proceeds.

In an interview conducted by Cregeur and relied upon by the FDIC, Dufty indicated that he never had a construction business, that he lived in a home without central heating or telephone service, that he used the loan proceeds to do some remodeling on the home and to purchase a used automobile, and that Defendant should not have given him the loans. He stated that he never told Defendant that the money was to be used to start a construction business and that Defendant gave him new loans to pay his old loans. He indicated that he signed the loan applications without reading them, not realizing that Defendant had noted the loans were for equipment for a construction business. (PSR ¶¶ 30-35.)

The PSR further states that while Defendant was extending Dufty more loans, Dufty was being kept at the same payment schedule. Typically, Dufty only paid interest and did not make any payments on the principal. At the time the loans were issued, Dufty was employed earning approximately $10.75 per hour.

-32-

Defendant testified that Dufty's loan history began in 1999, and that counts 4 through 10 represent renewal loans. Defendant testified that the original purpose of the 1999 loan was to finance the purchase of equipment, and that the purpose was simply carried over to the renewal loans, pursuant to the bank's policy in place at that time. The only loans that existed when Defendant left the bank are represented by counts 9 and 10. Defendant testified that Cregeur approved the count 10 loan, which was a renewal of count 8. At that time, the count 9 loan was the only other loan in existence. Defendant testified that Dufty was current on his loan payments when he made the renewal loans. Defendant claims that he accepted the information provided to him by Dufty and that Dufty was believed to be a capable person in the construction business.

The papers and testimony provided to the Court do not support a finding that Defendant engaged in any fraud as to counts 4 through 10. Cregeur's testimony that it was the bank's policy to carry forward the initial purpose of a loan to renewals of a loan supports Defendant's testimony. Additionally, there is no evidence that the business purpose for the original loan made in 1999 was erroneous, that it was erroneously maintained with the loan's bookkeeping, or that the loan did not have collateral to secure it. The loan documents themselves were not reviewed with a witness. Thus, the Court cannot find that Defendant knowingly made misrepresentations, or that misrepresentations were even made. Moreover, even if the evidence did not support that the loans stated the correct purpose, the evidence, at most, shows a lack of due diligence or mischaracterization of the collateral by Defendant, and not an intent to defraud or deceive. There was also no testimony suggesting any connection between Defendant's alleged misconduct and the bank's decisions to make these loans. That is, there was no testimony that Defendant's conduct was material to his supervisors' decisions, the discount committee's decisions, the board's decisions,

-33-

regulatory decisions, or audit review decisions.  Finally, apart from the fact that Signature Bank was alleged to be a common victim, there is no basis in the evidence to find the allegations related to Dufty as part of the same course of conduct or common scheme or plan as to count 82.  Thus, the conduct alleged in counts 4 through 10 is not relevant conduct.

<u>Counts 15 through 18</u>

According to the PSR, counts 15 through 18 involved the issuance of business loans to William Hagan.  The stated purpose of the count 15 loan was "equipment--building inspect deck--debt consolidation" for a farm business.  Defendant filled out the application from information received from Hagan and Hagan signed it.  In an interview by an unidentified person, Hagan is reported to have said that he did not review the document before signing it.

The PSR states that the actual purpose of the loan was for the consolidation of previous debt.  It further stated that no equipment was purchased for any farming business with the loan proceeds, that Hagan did not own and was not involved in running his own farm, that Hagan worked at another farm operation, and that Hagan occasionally completed drywall work.  According to the PSR, Hagan stated he correctly and accurately informed Defendant of his circumstances.  The count 16 through 18 loans were executed under basically the same circumstances.  (PSR ¶¶ 40-41.)

Defendant testified that the count 15 loan was a debt consolidation loan and that prior loans had been used by Hagan to finance drywalling work and to remodel his home.  Pursuant to the bank's policy, the stated purpose of the loan had been carried forward from prior loans.  With respect to the count 16 loan, Defendant testified that Hagan's wife was the daughter of a local dairy farmer and that Hagan worked on the dairy farm.  Defendant testified that Hagan told him that he intended to buy heifers and feeder cattle to raise, and that Defendant had no reason to disbelieve

him.

With respect to the count 17 loan, Defendant testified that Hagan told him it was to be used for a drywall machine, an ultrasound machine for pregnancy checks on cattle, and a truck to transport his equipment. Defendant testified again that he had no reason to disbelieve what Hagan told him. The loan application, which Defendant acknowledged preparing for Hagan, states that the purpose of the loan is equipment and feed and that Hagan's business involves drywall, farming, and cattle. Hagan signed the application.

With respect to the count 18 loan, Defendant testified that he believed that it was for Hagan's ultrasound business. Defendant stated that the loans were current when he left Signature Bank, and that Hagan still works at the dairy farm.

The papers and testimony provided to the Court do not support a finding that Defendant engaged in any fraud as to counts 15 through 18. The evidence supports that each loan was either used for the purposes specified or was a consolidation loan on which Defendant carried forward the purpose of the original loan pursuant to the bank's policies. Moreover, even if the evidence did not support that the loans stated the correct purpose, the evidence, at most, shows a lack of due diligence by Defendant, and not an intent to defraud or deceive. In sum, the evidence presented does not establish a scheme or artifice employed by Defendant to defraud or deceive the bank, that Defendant's conduct was material to the bank's business, or that Defendant had the intent to defraud or deceive the bank. Finally, apart from the fact that Signature Bank was alleged to be a common victim, there is no basis in the evidence to find the allegations related to Hagan as part of the same course of conduct or common scheme or plan as count 82. Thus, the conduct alleged in counts 15 through 18 is not relevant conduct.

Counts 19 through 37

According to the PSR, counts 19 through 37 involved consumer and business loans made to Leonard Garza by Defendant. Leonard Garza did not, according to the PSR, sign the loan application or the bank promissory note, nor was he the recipient of the loan proceeds. The actual borrower in this transaction was Leonard Garza's father, Manuel Garza. Manuel Garza had previously borrowed money from the bank and had encountered difficulty keeping up with the required payment schedule. He believed that it might be necessary for him to file bankruptcy.

Manuel Garza told an unidentified investigator that he had spoken to Defendant and advised Defendant that it would be necessary for him to file for bankruptcy protection. He told investigators that Defendant suggested that he could locate a co-signer or co-maker for a loan, who ended up being Leonard Garza, his son.

Leonard Garza testified that he did not sign any loans nor receive any proceeds from them. It was his understanding that his father may have signed a loan and received proceeds thereof. Leonard Garza did not have any prior knowledge of the loan or his alleged responsibility for the loan. He did not have an account at the bank, nor was he a customer there at the time these transactions took place.

Manuel Garza advised authorities that he suffers from depression and stated that he has Alzheimer's Disease. He admitted signing his son's name to most of the documents. He also advised that Defendant was the only individual at the bank that he dealt with in connection with his loans. In the next several years, Manuel Garza refinanced a number of existing loans and obtained some new loans using his son's credit.

Counts 28, 29, 30, and 37 involved business loans in Leonard Garza's name. The stated

purpose of the loans was investment in a restaurant. As in the consumer loans, Leonard Garza was not aware of what was happening and he testified that the did not receive any of the credit. The actual loan documents were signed by Manuel Garza. Manuel Garza told investigators that he had not told Defendant that the loans were for a restaurant business and that he often signed documents that Defendant prepared without reading them. (PSR ¶¶ 42-48.)

According to Defendant, when Manuel Garza had difficulty repaying his loans, Defendant told him that he could not receive any further loans. Defendant testified that Manuel Garza suggested that Leonard Garza, his son, could guarantee or become a co-obligor for the loans. Defendant testified that he spoke to Leonard Garza over the phone and that Leonard Garza agreed to assist his father, a practice Defendant continued when he later became a loan officer at Northstar Bank. Indeed, Leonard Garza acknowledged guaranteeing the Northstar Bank loans.

Count 19 was a loan for home repairs, count 20 was a loan for an automobile, and then count 21 was a consolidation of 19 and 20. Count 22 was for an automobile and count 23 was to repair a furnace. Count 24 was a renewal of count 23, count 25 was for house repairs, and count 26 was a renewal of count 24. Count 27 was for insurance on the house, count 28 was a renewal of count 21, count 29 was a consolidation of several other loans. With respect to count 30, Defendant testified that he spoke to Leonard Garza and that the loan was for his father to take a trip to Texas for a funeral. Count 31 was for funeral expenses.

Count 32 was a renewal of count 29. Count 33 was for house insurance, count 34 was a consolidation of count 33 and an additional loan for insurance and property taxes. Count 35 was a consolidation of count 34 and an additional loan for insurance. Count 36 was for insurance and count 37 was a consolidation of 29, 30, and 31. The only loans that were open when Defendant left

the bank were 32, 36, and 37, and they were current.

Leonard Garza signed the original two notes and everything about the loans was approved by Cregeur. Defendant testified that unbeknownst to him, Manuel Garza signed Leonard Garza's name on the later notes. Defendant testified that he had no reason to believe that Leonard Garza was not signing the documents. The bank's policy permitted borrowers to take loan documents outside of the bank to be signed and that is how the loan documents were signed. Defendant testified that Leonard Garza's brother did have a restaurant and that Manuel Garza told Defendant that the purpose of the business loans was to invest in the restaurant.

The papers and testimony provided to the Court do not support a finding that Defendant engaged in any fraud as to counts 19 through 37. The evidence supports that each loan was either used for the purposes specified, was a consolidation loan on which Defendant carried forward the purpose of the original loan pursuant to the bank's policies, or may have contained misinformation provided by the borrowers or was fraudulently executed by Manuel Garza. There was no evidence presented to suggest Defendant's knowledge of Manuel or Leonard Garza's misbehavior. While Defendant may not have performed due diligence, the Court cannot find that Defendant knowingly made misrepresentations. In sum, the evidence presented does not establish a scheme or artifice employed by Defendant to defraud or deceive the bank, that Defendant's conduct was material to the bank's business, or that Defendant had the intent to defraud or deceive the bank. Finally, apart from the fact that Signature Bank was alleged to be a common victim, there is no basis in the evidence to find the allegations related to Garza as part of the same course of conduct or common scheme or plan as count 82. Thus, the conduct alleged in counts 19 through 37 is not relevant conduct.

Counts 38 through 40

According to the PSR, counts 38, 39, and 40 involved three business loans to Ronald Haag, Jr. Count 38 involved Defendant filling out a loan application, processing, and approving a business purpose loan for Haag. Defendant wrote on the loan application that Haag was involved in farming and that the purpose of the loan was to finance the purchase of cows. The source of funds to be used for repayment of the loan would be profits and the security for the bank would be the cattle themselves.

During this time, Haag worked on his father's dairy farm but did not personally own any cattle. Haag told unidentified investigators that he was not aware the loan application stated that the loan was for cattle. The loan was used for the purchase of a pickup truck. Haag quit working at the farm in February 2004. While working at the farm, he earned less than $700 every two weeks and grossed no more than $10,000 for the year. Haag told investigators that he did not believe that he owned any of the farm's equipment or cattle. After February of 2004, Haag obtained employment earning $32,000 annually. Haag advised investigators that Defendant knew he had left the farm and was working for his employer when he applied for the subsequent loans.

In regard to Counts 39 and 40, Defendant personally processed and approved these loans. For these two loans, the government contended that Haag did not have knowledge of or authorize the loan. The signature on the loan application is the signature of his father. Indeed, Haag's father told investigators that he signed the application at the bank.

The stated type of business activity that Haag was purportedly involved in at the time of the loan application was farming. Defendant wrote that the source of funds to be used for repayment of the loan would be "$1,000 per month." A note at the bottom of the application states, "Farms

-39-

with dad--has own cows. 30 cows. He gets prorated income from dairy operations." Also included in the loan file was a personal financial statement indicating that Haag owned $45,000 worth of cattle and the security made available to the bank for the loan would be cattle and machinery. The loan file also contained an unlimited continuity agreement dated December 14, 2004. A personal financial statement of Haag in the loan file states that Haag had $1,000 worth of feed, a $7,000 pickup truck, the aforementioned $45,000 in cattle, and $2,000 in equipment. (PSR ¶¶ 49–53.)

According to Defendant, the information stated on the applications was supplied by Haag. Defendant testified that for counts 38 and 39, Haag signed the loans in front of Defendant. Defendant believed that the information provided by Haag was correct. The count 40 loan consolidated each of the earlier credits into a single loan and was taken out of the bank by Haag's father to have Haag sign. The document was returned to the bank by Haag's father. The consolidated loan was current when Defendant left the bank.

The papers and testimony provided to the Court do not support a finding that Defendant engaged in any fraud as to counts 38 through 40. The evidence supports that each loan was either used for the purposes specified, was a consolidation loan on which Defendant carried forward the purpose of the original loan pursuant to the bank's policies, or contained misinformation provided by the borrowers. While Defendant may have known that Haag's father was structuring the loan and collateral to be his son's for a reason, the reason for the exercise was not explained nor any evidence offered of Defendant's complicity in the practice. In sum, the evidence presented does not establish a scheme or artifice employed by Defendant to defraud or deceive the bank, that Defendant's conduct was material to the bank's business, or that Defendant had the intent to defraud or deceive the bank. Thus, the conduct alleged in counts 38 through 40 is not relevant conduct.

Count 41

Count 41 is a charge of making false entries. According to the PSR, on or about August 5, 2005, Defendant executed and approved an $8,000 consumer loan to Frederick Krueger. The stated purpose of the loan application was to build a garage onto a house. The loan file for Krueger included two 1040 income tax statements, both for Krueger and both for 2004. One of the returns showed Krueger's income as $18,738. The other showed his income to be $8,738. Also included in the loan file was a personal financial statement from Krueger reflecting $27,000 in assets, $15,000 of which was personal property, and the balance represented automobiles in his possession.

According to the PSR, Krueger's actual income in 2004 was $8,738, and he did not submit to the IRS, to Defendant, or to anyone else, a tax return for that year showing $18,738 in income. The PSR does not identify the source of this information. Krueger apparently told someone that he was unable to identify what comprised the $15,000 of personal property listed on the financial statement. He further stated that although he could not recall submitting personal financial statements to Defendant for the loans, the handwriting on the financial statements appeared to be his. Examination of the false $18,738 tax return disclosed that someone had placed a "1" in front of the $8,738 and placed the return in the file.

According to Defendant, it is his recollection that the loan to Krueger was made in 2003 and that it is unlikely that the January 1, 2005 date is correct because that is New Year's Day, a holiday. Defendant stated that the information on the application was supplied by Krueger and that the loan was made before he filed any income tax for 2004, which would not have been due until at least April 15, 2005. In other words, the tax return was not available at the time the loan was processed. Defendant stated that he did not make any changes on any tax returns for anyone and, in particular,

for Krueger. He stated that if there are in fact two tax statements in the file for the same time period and are contradictory, Defendant did not change them in any manner and he has no knowledge of who, if anyone, may have changed any such documents.

The papers and testimony provided to the Court do not support a finding that Defendant engaged in any fraud, or made a false statement with the intent to deceive, as to count 41. The duplicative tax returns were not noticed by anyone at Signature Bank until after Defendant left the bank, but they were not hidden in any way. Additionally, according to Defendant, the tax return would not yet have been available at the time that the loan was made. The tax returns would have been placed in the file after the loan was made. There is no reason to disbelieve Defendant that he had knowledge of the altered return and no one from the bank testified about how the tax returns were material to their loan decisions. Finally, apart from the fact that Signature Bank was alleged to be a common victim, there is no basis in the evidence to find the allegations related to Krueger as part of the same course of conduct or common scheme or plan as count 82. Thus, the conduct alleged in count 41 is not relevant conduct.

<u>Counts 49-52</u>

According to the PSR, counts 49 and 50 involved business loans to Kimberly Harding, and counts 51 and 52 involve consumer loans to Harding. At the time the loan applications were made, Harding was a waitress involved in a personal relationship with Keith Peters, a married man. Harding was also purportedly involved in a craft shop, and the source of funds to be used for repayment of the business loan was profit. The security made available to the bank for the loan was "all assets" and a 1999 Jeep that was said to be worth $9,000. A note appeared on the application which stated, "Has craft shop in Caseville, reference by Keith Peters. Chief value--$9,500.

Inventory--$15,000."

According to the PSR, based upon an interview between Vice President Heimer and relied upon by the FDIC with Harding, Defendant knew that Harding was not the intended recipient of the loan proceeds. She had signed a loan application, which she believed was for the financing of her Jeep, but she did not sign the note or the officer's check for the loan proceeds. She did not own any inventory or working capital for a craft shop.

According to the PSR, Keith Peters was interviewed by unidentified investigators. Peters stated that it was Defendant's idea to have Harding take out the loans in her name and to use the operation of the craft shop as the stated loan purpose, because Peters did not qualify for additional credit at that time. Peters also stated that Defendant instructed him to cash the officer's check for the proceeds at a different bank or at least a different location of Signature Bank. A Suspicious Activity Report prepared by Cregeur in November 2005 stated: "This action appears to have been an act of collusion between the lender, [Defendant,] and the ultimate receiver of funds, Keith Peters, without the knowledge of the borrower, Kimberly Harding."

The PSR states that the stated purpose of the loan implicated in count 51 was the financing of a 2005 GMC Sierra pickup truck. The application stated that Harding was self-employed at a craft store. The officer's check for the loan proceeds bears Harding's signature, as converted to an officer's check made payable to Peters. The check made payable to Peters was deposited into an account at another bank on April 29, 2005. The GMC Sierra referred to in this loan application was already owned by Peters and his wife and had been financed by GMAC one month prior to origination of this loan. According to the PSR, the stated purpose for the loan implicated by count 52 was to finance the purchase of a 2005 GMC pickup.

Peters testified that he falsely used Harding's name and signed her name. He testified that he never talked to Harding or Defendant regarding a craft store, but that he took the papers home for Harding to sign. He testified that Harding did not let him use her identity, and that Defendant told him to cash the check at another branch.

Defendant testified that Peters approached him about setting up a craft shop for Harding to operate. Defendant testified that ultimately, he set up a "general filing on all assets"; Harding signed the loan represented by count 49 and Peters guaranteed it. Defendant testified that the loan represented by count 50 was made when Peters came in and told Defendant that he and Harding needed additional funding for the craft shop. Defendant testified that he believed that Harding signed the loan documents.

Defendant testified that loan 51 was formed when Shirley Peters informed him that she was purchasing a 2005 GM Sierra pickup truck. Shirley Peters called Defendant and asked if Keith Peters could bring the paperwork home. Defendant testified that Keith Peters took the documents home for Shirley Peters' signature, and when the documents were returned, he made out a check to Harding. Defendant testified that he did not do a title search on the vehicle, but that he had been under the impression that the vehicle was being purchased from an individual. He testified that it was the bank's normal policy to put a lien on the vehicle after the customer had the title transferred. Defendant testified that he was not sure if that was ever done, but that if it was not, a review of the loan documents by an internal or external auditor would generally lead to a letter to Peters requesting the title to show the lien.

Defendant testified that the loan represented by count 52 was a renewal as to count 51. He testified that Keith Peters came in to get the paperwork to renew it. He testified that the account had

been turned over to another loan officer at that point, who told Defendant to renew it. Defendant testified that he probably completed the paperwork, but that the new loan officer was aware of it. Finally, Defendant testified that the open loans related to counts 49, 50 and 52 were current when he left employment at Signature Bank.

Significantly, none of the loan documents related to these transactions was reviewed during the testimony provided by the bank officers. Nor has Cregeur's memo, which was used by the FDIC investigators, introduced into evidence. Notably, the bank's internal policies allowed documents to be taken out of the bank for signatures. There does not appear to be any evidence by which the Court can impute knowledge to Defendant that Peters used Harding's name, apparently without her consent. Thus, the Court finds that counts 49-52 are not related conduct.

<u>Counts 53-73</u>

According to the PSR, counts 53 through 73 deal with various business loans and business renewal loans made to Keith and Shirley Peters, Keith Peters alone, and Shirley Peters alone. The PSR states that count 53 involved a business loan to Keith and Shirley Peters, that Defendant filled out the loan application, and that the Peters signed the application. The stated purpose of the loan was for equipment for a restaurant operated by the Peters, and fire insurance proceeds were to be used for repayment of the loan. The PSR states that count 54 represents a business renewal loan related to the restaurant and that the security for the loan was Keith Peters' real estate mortgage. Counts 55 and 56 were also business renewal loans related to the restaurant.

According to the PSR, Peters never intended to use the proceeds from the original loan solely for equipment or operating a business as the loan terms required. Moreover, the property was not owned by the Peters and the actual owner was not aware that the Peters had used the property as

collateral, which the Peters could not legally do.  According to the PSR, at some point, the bank determined that the maximum debt that the Peters could carry, given the annual gross revenue of the restaurant, was $42,000.

According to the PSR, count 57 involved a business loan to Keith Peters.  The stated purpose of the loan was the operation of a catering business, and the loan application was signed by Keith Peters.  The PSR states that Defendant knew that Keith Peters did not intend to use the loan proceeds solely for the operation of the catering business, but to make payments to a car dealership.  The PSR states that Keith Peters told investigators he did not request loan proceeds for any type of catering business and that the loans were for his personal expenses.  Keith Peters told investigators that his wife had a catering business she operated during the summer months.  According to the PSR, counts 58 and 59 involved business renewal loans to Keith Peters; the applications state that the loans were to be used for the operation of their restaurant.

According to the PSR, count 60 was a business loan to Keith and Shirley Peters; the stated purpose of the loan was "build home"; and repayment and security would be made through profits and sale of real estate mortgage.  According to the PSR, count 61 was a business loan to Keith Peters and the stated purposed of the loan was building inspections, presumably related to the restaurant.  According to the PSR, count 62 was a business loan to Keith and Shirley Peters with a stated purpose of "build home construction REM"; the loan proceeds were used to pay off previous loans.  According to the PSR, at the time of these loans, the Peters were not involved in any building activities with respect to the restaurant, which Keith Peters told unidentified investigators.

According to the PSR, counts 63 through 73 all relate to business loans that Defendant made to Keith and Shirley Peters, Shirley Peters alone, or Keith Peters alone.  According to the PSR, the

-46-

loan applications were completed by Defendant and signed by the Peters. The PSR states that the intended use of each of the loans was for something different than stated on the loan applications.

For the most part, Keith Peters testified that he did not recall much information related to the loans he had with Signature Bank. He did however testify that his wife was involved with catering during the summer months.

According to Defendant, the loans reflected by counts 53 through 67 and made between October 2002 and June 2004 no longer existed, but were either paid or consolidated into the loans related to counts 68 through 73 in 2004 and 2005. The FDIC report focused on the Peters loans as particularly reflective of Defendant's "poor decision making, reckless lending and deliberate dishonesty." The author examined each of the loans suggesting, at a minimum, that there was no justification for renewing the loans because it was clear that the loans could not be repaid. The report summarized the information as follows:

> The most egregious example is that of the lending relationship with Keith and Shirley Peters. The loans made to Keith and/or Shirley Peters beginning October 15, 202 are described in the following timeline. Regarding all of the loans in the below table, only four interest payments could not be traced to having been made directly by a new or renewed loan. Those four interest payments total $1,054 and were probably indirectly made by the new loans from the portion of those loans that were deposited into Peters' account first, rather than being a direct payment from the loan proceeds. All of the other payments, both principal and interest payments, for all of the loans, were made by loan renewals, new loans or renewed loans with new money. Exhibit [TT] show all of the original loans and Exhibit [UU] shows certain loan proceeds checks and, where possible, how the funds were used (i.e. to pay off other loans, deposited into Keith Peters' bank accounts etc.)

Defendant responded to the FDIC investigation by a letter dated June 7, 2006 acknowledging that, "In hindsight, the original loan made to Mr. Peters did not turn out to be a good credit decision." Defendant emphasized that the loans "met all of the Bank's underwriting criteria." During the hearing, Defendant explained that the Peters faced a series of problems that affected their

-47-

cash flow and thus their ability to repay the loans. Keith Peters had a hernia attack that disabled him in 2003. The Peters' first restaurant, a well-established business in Port Austin known as "Sweeties," burned in 2002 and insurance proceeds took a period of time to be paid. In the interim, Keith Peters began looking for a restaurant business in Caseville. In addition, the nature of the business was cyclical, with high traffic in the summer months and low traffic during the winter. However, each of these loans were reviewed by Cregeur in the ordinary course of business and Keith Peters' loans were the subject of an extensive review in July 2005, with Vice President Heimer. Defendant explained that they all understood it was a workout circumstance, that they accepted his explanations and concluded that they would just have to wait to see how things worked out. Indeed, Defendant explained that Keith Peters' attorney was a member of Signature Bank's board of directors.

The papers and testimony provided to the Court do not support a finding that Defendant engaged in any fraud as to counts 53 through 73. The evidence supports that each loan was either used for the purposes specified, was a consolidation loan on which Defendant carried forward the purpose of the original loan pursuant to the bank's policies, or contained misinformation provided by the borrowers. While Defendant may not have performed due diligence, the Court cannot find that Defendant knowingly made misrepresentations. In sum, the evidence presented does not establish a scheme or artifice employed by Defendant to defraud or deceive the bank, that Defendant's conduct was material to the bank's business, or that Defendant had the intent to defraud or deceive the bank. Thus, the conduct alleged in counts 53 through 73 is not relevant conduct.

<u>Counts 74 and 75</u>

Counts 74 and 75 are charges of making false entries. According to the PSR, counts 74 and

75 involve Defendant's preparation of a personal financial statements for Keith and Shirley Peters. As to count 74, the PSR states that Defendant prepared a financial statement which represented that the Peters' assets included an insurance claim in the sum of $20,000. According to the PSR, no such claim existed.

As to count 75, the PSR states that Defendant intentionally used a property that was no longer owned by the Peters as collateral for a loan. The PSR states that Defendant placed a financial statement in the Peters' file that reflected ownership of the property even though he knew the Peters no longer owned the property. The financial statement also reflected assets including a 401K plan valued at $15,000, and real estate titled "sweetie's lot" valued at $110,000. According to the PSR, Keith Peters did not have a 401K plan or any ownership interest in the "sweetie's lot" as of the date set forth in the financial statement.

Peters testified he obtained the information that Defendant used to fill out the financial statements from his accountant. Defendant testified that he filled out the financial statements based on the information provided by Keith Peters and that Keith Peters signed the statements.

The papers and testimony provided to the Court do not support a finding that Defendant engaged in any fraud or made a false statement with the intent to deceive as to counts 74 or 75. The evidence supports the proposition that Defendant created the financial statements based on the information provided by Peters or his accountant. While Defendant may not have performed due diligence, the Court cannot find that Defendant knowingly made misrepresentations. Finally, apart from the fact that Signature Bank was alleged to be a common victim, there is no basis in the evidence to find the allegations related to counts 74 and 75 as part of the same course of conduct or common scheme or plan as count 82. Thus, the conduct alleged in counts 74 and 75 is not relevant

conduct.

Counts 76-80

According to the PSR, counts 76 through 80 involve business loans that Defendant made to Diane Spencer after he became employed by Northstar Bank in September 2005. The stated purpose of the loans was for cattle and farming expenses. According to the PSR, Diane Spencer was not involved in the farming business nor was she contemplating doing so.

Defendant contends that the Spencers had been dairy farmers who had gone through bankruptcy, but continued to raise heifers or steers and were ultimately going to and did remodel a home which is being used as a foster care home with the intentions of continuing to raise some heifers and steers on the property. Defendant states that loans related to counts 76 and 77 were consolidated into the loan related to count 79. Defendant further states that all of the loans were converted into a mortgage note that is being amortized.

The papers and testimony provided to the Court do not support a finding that Defendant engaged in any fraud as to counts 76 through 80. As the Court has previously discussed in relation to other counts involving the Spencers, affidavits and testimony support Defendant's testimony that the family was in the agricultural business during the relevant period of time. The evidence also supports that each loan was either used for the purposes specified or was a consolidation loan on which Defendant carried forward the purpose of the original loan pursuant to the bank's policies. Moreover, even if the evidence did not support that the loans stated the correct purpose, the evidence, at most, shows a lack of due diligence by Defendant, and not an intent to defraud or deceive. In sum, the evidence presented does not establish a scheme or artifice employed by Defendant to defraud or deceive the bank or that Defendant had the intent to defraud or deceive the

bank. Also, none of the management representatives testified about how or why Defendant's bookkeeping or reporting of the loans were material to management's decisions. Finally, apart from the fact that Signature Bank was alleged a common victim, there is no basis in the evidence to find the allegations related to the Spencers are part of the same course of conduct or common scheme or plan as count 82. Thus, the conduct alleged in counts 76 through 80 is also not relevant conduct.

III

U.S.S.G. § 3B1.3, in relevant part, provides:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.

The guideline's reference to "trust" draws upon a body of law regarding fiduciaries and trustees.

*See United States v. Ragland*, 72 F.3d 500, 502-503 (6th Cir. 1996).

Application Note 1 to this guideline, in relevant part, provides:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult).

The note offers as examples a lawyer who is to serve as guardian for a client's funds or "a bank executive's fraudulent loan scheme." *Id*. Yet embezzlement or theft by an ordinary bank teller or clerk would not fall within the guideline, due to the lack of discretion that role usually has. *Id*.

"[T]he level of discretion accorded an employee is to be the decisive factor in determining whether his position was one that can be characterized as a trust position." *United States v. Tribble*,

-51-

206 F.3d 634, 637 (6th Cir. 2000). In *United States v. Berridge*, 74 F.3d 113 (6th Cir. 1996), the Sixth Circuit affirmed a trial court's conclusion that the defendant, a bank vice president, had abused a position of trust when he made false statements on a loan application. Although the bank directors and officers supervised his business decisions and although he attended regular meetings to answer questions regarding loans, his role as vice president showed that his superiors trusted him with certain responsibilities. His responsibilities included writing off and granting loans, so his conduct contrary to the authority granted in that position demonstrated an abuse of trust. *Id.* at 117; *see also United States v. Humphrey*, 279 F.3d 372, 381 (6th Cir. 2002) (holding that a bank's vault teller, who handled daily cash and food stamps, did not have a trust relationship with her employer because she did not administer its property).

Here, Defendant was invested with a great deal of discretion by his supervisors, by the bank officers, and by the board of directors of Signature Bank. The evidence that Defendant abused the discretion or trust invested in him is, however, scant at best. On the contrary, bank management testified that Defendant was well supervised for twenty-five years without any material concerns and that his increasing responsibility for bank customers was met with positive job performance reviews and increased compensation. Whatever the genesis for management's concerns about Defendant's practices beginning in late 2004, it is simply incredible, based on the evidence, to suggest that he was exercising the trust invested in him in any way other than as expected. Despite the unusually extensive loan portfolio, Cregeur acknowledged that while Defendant had loan losses, his overall performance was unusually successful. Moreover, no witness testified that they believed that Defendant ever intended to harm Signature Bank. In summary, the evidence warrants the conclusion that Defendant exercised the trust invested in him in precisely the way bank management expected

and encouraged.

Moreover, specifically with respect to count 82, to which Defendant entered the *nolo contendere* plea, Defendant was clearly not acting in a position of trust. Count 82 relates to a July 29, 2005, incident in which Defendant executed a draw of $4,500 on a commercial line of credit account of Diane and Clinton Spencer, but deposited the funds into Keith Peters's account without the authorization or knowledge of the Spencers. In this situation, Defendant would not have had any discretion. Neither the bank nor the Spencers provided Defendant with any discretion to perform draws on a customer's line of credit without their authorization.

Furthermore, Defendant did not "abuse" any trust that may have been invested in him by the "victim" of count 82, the Spencers. *See United States v. White*, 270 F.3d 356, 371 (6th Cir. 2001) (holding that "[t]he abuse-of-trust enhancement may only be applied where the defendant abused a position of trust with the victim of his charged conduct). As already discussed in the analysis of count 3, there was nothing about the way that the transaction was implemented that in any way would have suggested that the transaction, erroneous as it might be, was hidden from either the Spencers or Signature Bank. The evidence does not show that Defendant did anything to hid the draw made on the Spencers' account. The two-level increase for Defendant's abuse of trust reflected in the PSR should not be included.

IV

Based on the above and the Court's prior opinion, the guideline range for Defendant's sentence can be completed. Defendant's base offense level is seven because Defendant was convicted of an offense referenced in U.S.S.G. § 2B1.1(a)(1), and the offense of conviction has a statutory maximum term of imprisonment of twenty years or more. No adjustments to the based

-53-

offense level are warranted based on the amount of loss under U.S.S.G. § 2B1.1(b)(1)(H), based on

an abuse of trust under U.S.S.G. § 3B1.3, or for Defendant's acceptance of responsibility under

U.S.S.G. § 3E1.1.  An offense level seven coupled with an unobjected to criminal history category

of I yields a guideline range of zero to six months.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: June 23, 2009

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 23, 2009.

s/Tracy A. Jacobs
TRACY A. JACOBS

---